815 F.2d 890
 22 Fed. R. Evid. Serv. 1072
 The TRUSTEES OF the UNIVERSITY OF PENNSYLVANIA, Appellee,
v.
LEXINGTON INSURANCE COMPANY, Appellant,
v.
AFFILIATED RISK CONTROL ADMINISTRATORS OF PENNSYLVANIA, INC.
and Insurance Company of North America, Aetna Insurance
Company, Cigna Companies and Johnson & Higgins of
Pennsylvania, Inc. and Alexander & Alexander, Inc. and Duane
Morris & Heckscher, a Pennsylvania Partnership and McCabe,
James J. Esquire individually and Medical Professional
Liability Catastrophe Loss Fund.
 Nos. 86-1115, 86-1195.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 14, 1986.
Decided March 31, 1987.
 
 Harvey Bartle, III (argued), Judy Yun, Dechert Price & Rhoads, Philadelphia, Pa., for appellee.
 Robert A. Korn (argued), Glenn F. Rosenblum, Philip A. Tordella, Robert D. Billet, Korn, Kline & Kutner, Philadelphia, Pa., for appellant.
 David B. Adams, Philadelphia, Pa., for appellee, Affiliated Risk Control Administrators.
 Before GIBBONS, Chief Judge, BECKER, Circuit Judge and BROWN, District Judge.*
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 This appeal, from a judgment entered on a jury verdict in favor of an insured against its excess carrier, raises several questions of Pennsylvania insurance law. The Trustees of the University of Pennsylvania, the corporate owner of the Hospital of the University of Pennsylvania ("HUP"), and the plaintiffs in the district court, won a $4.8 million judgment in compensatory damages against the Lexington Insurance Co., HUP's excess insurer. The jury also awarded punitive damages, attorneys' fees and prejudgment interest. The claim arose from Lexington's refusal to pay its share of a settlement in a suit against HUP by Mrs. Estelle Soppe, who had suffered catastrophic injuries from the administration of a contaminated diagnostic test fluid at the hospital.
 
 
 2
 Initially, we must consider Lexington's contention that it is absolved from liability because HUP did not give timely notice of the claim and HUP's contention that lack of timely notice does not save Lexington because Lexington was not prejudiced. We conclude: (1) that the question of late notice and prejudice was for the jury; (2) that the district court gave erroneous instructions on the policy's notice requirements; but (3) that the rule of Brakeman v. Potomac Ins. Co., 472 Pa. 66, 371 A.2d 193 (1977), requiring the insurer to prove prejudice as a condition of disclaimer, applies to this case despite the relative sophistication of the insured, hence late notice is not conclusive; and (4) that the faulty instructions were harmless because the jury rejected Lexington's claims of prejudice. We conclude that the jury's verdict was supported by substantial evidence.
 
 
 3
 We next consider the enforceability of the two-tiered settlement entered into between HUP and Mrs. Soppe. This type of settlement provides for the tort victim to recover a larger amount if the insurer is liable than if the tortfeasor must pay the settlement out of its own pocket. We find that Pennsylvania would approve the two-tiered settlement involved in this case, so long as the amount the insurer must pay was reasonable and was sincerely believed to be reasonable by the insured. Despite some problematic evidentiary rulings which we also find to constitute harmless error, we conclude that the record supports the jury's determination that the two-tiered settlement was reasonable and entered into in good faith. We therefore sustain the judgment for Lexington's share of the underlying settlement.
 
 
 4
 We also affirm the awards of prejudgment interest and attorneys fees. With respect to the latter, we reject the argument that, while Pennsylvania permits an award of attorneys fees in an action to establish the insurer's breach of a duty to defend, it would not permit an award to enforce a duty to indemnify. However, we set aside the award of punitive damages, concluding that Pennsylvania would not recognize an action for punitive damages against an insurer even where the insurer refuses in bad faith to compensate its insured.
 
 I. FACTS AND PROCEDURAL HISTORY
 
 5
 On June 9, 1981, Estelle Soppe, HUP's fifty-four year old director of volunteer services, drank a contaminated and highly toxic magnesium sulfate solution while undergoing a simple diagnostic procedure at the hospital. Dr. Bruce Trotman, a staff physician, supervised the test. As a result, Mrs. Soppe lost ninety percent of her small bowel as well as her gall bladder, spleen and one kidney. Having lost the ability to digest food, she is fed by a tube inserted in a vein leading to her heart, a long, laborious and painful process which requires most of her waking day.
 
 
 6
 At the time of the incident, the hospital's medical malpractice insurance consisted of three tiers. The first tier, as required by Pennsylvania law, 40 Pa.Stat.Ann. Sec. 1301.701(a)(1)(i) (Purdon Supp.1986), was provided by the hospital and consisted of $100,000 coverage for itself and $100,000 for Dr. Trotman. The second tier, provided by the Pennsylvania Medical Professional Liability Catastrophe Loss Fund (the "CAT Fund"), a state agency, consisted of $1 million coverage for each health care provider (i.e., HUP and Dr. Trotman). See 40 Pa.Stat.Ann. Sec. 1301.701 (Purdon Supp.1986). The third tier, known as excess or umbrella coverage, was provided by Lexington in the amount of $10 million.
 
 
 7
 Under Condition 5 of the HUP-Lexington policy, HUP had the obligation to notify Lexington of a potentially covered claim:
 
 
 8
 Whenever the Insured has information from which the Insured may reasonably conclude that an occurrence covered [by the policy] involved injuries or damages which, in the event that the Insured should be held liable, is likely to involve this policy, notice shall be sent to the Company as soon as practicable, provided however, that failure to notify the Company of any occurrence which at the time of its happening did not appear to involve this policy, but which at a later date would appear to give rise to claims hereunder, shall not prejudice such claims.
 
 
 9
 The policy also provided, however, that Lexington had no right to assume the defense of suits against HUP. Lexington had the right only "to associate with the Insured or the Insured's underlying insurer, or both, in the defense and control of any claim ... where the claim ... involves, or appears reasonably likely to involve Lexington."
 
 
 10
 Notwithstanding Condition 5, HUP did not notify Lexington after Mrs. Soppe's tragic accident, though it did initiate its own investigation. Approximately ten months later, on April 19, 1982, HUP received a request for Mrs. Soppe's medical records from the law firm of Litvin, Blumberg, Matusow & Young ("Litvin"), a firm with a reputation for prowess in medical malpractice cases. Ten months after this request, in February of 1983, Litvin brought a malpractice action on behalf of Mrs. Soppe against the hospital and Dr. Trotman in the Court of Common Pleas of Philadelphia County.
 
 
 11
 HUP engaged the law firm of Duane, Morris & Heckscher to conduct the defense both for HUP and Dr. Trotman, and the firm proceeded to investigate the case, to file an answer and to conduct discovery. On October 31, 1983, the Court granted Mrs. Soppe's petition for special listing. In early December, 1983, Litvin forwarded to the court and to HUP an evaluation of Mrs. Soppe's injuries which described a damage potential of $5 to $10 million. For apparently unrelated reasons, HUP's malpractice consultants, ARCAP, finally advised HUP to notify its excess insurers in a letter dated December 5, 1983. HUP did so on December 19.
 
 
 12
 On February 18, 1984, Lexington wired HUP disclaiming coverage on grounds of late notice. Lexington took the position that this late notice had prejudiced it for three reasons: (1) unspecified "gross mishandling" of the investigation and legal defense; (2) a failure of HUP's counsel to explore additional theories of liability that would involve other health care providers or HUP's products liability insurer; and (3) the failure of HUP's counsel to prosecute cross-claims against Dr. Trotman because of a conflict of interest. (360a-361a). At the time of the letter, the Soppe action was scheduled for trial on February 28, 1984, although it was ultimately postponed until April of that year.
 
 
 13
 In early April, 1984, on the even of trial, Mrs. Soppe, HUP and Dr. Trotman reached a settlement. Under the terms of the settlement, Mrs. Soppe agreed to accept $2.2 million from HUP's own (self-insurance) coffers and from the CAT Fund. HUP also agreed to pay an additional $4.8 million if it was successful in the suit it had brought against Lexington. Pending that suit, HUP agreed to pay Mrs. Soppe $550,000, for which it would be reimbursed by payment of one third of the proceeds of the suit against Lexington until that $550,000 was satisfied. The settlement also provided that if HUP did not win its suit against Lexington, it would pay Mrs. Soppe an additional $1.6 million over the next two years and would guarantee payment of Mrs. Soppe's lifetime medical expenses, which promised to be enormous.
 
 
 14
 On April 23, 1984, Mrs. Soppe, HUP and Dr. Trotman presented this settlement to Judge Bernard Goodheart of the Court of Common Pleas of Philadelphia County. Pursuant to the parties' request, Judge Goodheart considered the relative merits of the settlement and expressed his approval. On May 17, 1984, the parties again appeared before Judge Goodheart, this time to permit a Deputy Attorney General of the Commonwealth of Pennsylvania, Lawrence Barth, to present his views that the settlement was in the best interests of HUP. Mr. Barth purported to appear in the exercise of the Attorney General's responsibility of overseer of Pennsylvania charities, although there was no apparent need for his appearance.
 
 
 15
 On April 2, 1984 (prior to presentation of the settlement to Judge Goodheart), HUP instituted the present suit in the Eastern District of Pennsylvania against Lexington seeking a declaratory judgment, damages in the sum of $4.8 million to satisfy the Soppe settlement, punitive damages and attorneys' fees. After trial, the case was submitted to a jury on special interrogatories. The jury found that HUP's notice was not late according to the requirements of the HUP-Lexington policy. Accordingly, in conformance with its charge, the jury made no finding whether Lexington had been prejudiced by late notice. The jury also found that the settlement in the Soppe case was reasonable and made in good faith, and that Lexington's denial of coverage was in bad faith and so outrageous as to entitle HUP to punitive damages as well as attorneys' fees. The jury then awarded punitive damages in the amount of $500,000. Following the jury verdict, the district court awarded HUP's attorneys' fees in the amount of $148,938.00 and costs of $17,602.30. The district court denied Lexington's motions for judgment n.o.v. and for a new trial. Lexington filed this timely appeal.
 
 II. NOTICE
 A. Timeliness
 
 16
 Lexington first claims that the judgment should be overturned because notice of the claims was late under the policy as a matter of law.
 
 
 17
 The policy provided for HUP to notify Lexington "as soon as practicable" after HUP had information from which it "may reasonably [have] conclude[d]" that injuries or damages were likely to involve the policy. Lexington notes that Mrs. Soppe received all her medical care from HUP after her accident, so that HUP had all the necessary information from which it could determine the magnitude of Mrs. Soppe's injuries as they developed in the period following the accident. Lexington claims that at least from April 19, 1982, when the Litvin firm requested Mrs. Soppe's medical records, suit was obviously inevitable, and that it was clear that any suit was likely to involve Lexington's policy because of the catastrophic nature of Mrs. Soppe's injuries. At the latest, claims Lexington, HUP's obligation to notify was triggered when Mrs. Soppe filed suit in February, 1983.
 
 
 18
 Despite these indications, HUP waited until December 1983, ten months after Mrs. Soppe had filed suit, before providing notice. Noting that the Pennsylvania Supreme Court has upheld a trial court's directed verdict that eight months following an accident was not "as soon as practicable," Farmers Nat'l Bank of Ephrata v. Employers Liab. Assurance Corp., 414 Pa. 91, 199 A.2d 272, 274 (1964), Lexington argues that notice was late here as a matter of law.
 
 
 19
 Farmers Nat'l Bank and other cases relied on by Lexington concern the amount of time that may pass after circumstances have triggered the duty to notify that may still be "as soon as practicable." The principal question in this case, however, is when the duty was triggered. HUP defends its delay in giving notice on two grounds.
 
 
 20
 First, HUP claims that its notice was not late because HUP did not know the cause of Mrs. Soppe's injuries and believed them not to be the result of the hospital's activities (in particular, the administration of contaminated magnesium sulfate solution) until it received a report to the contrary from one of its experts in October, 1983. We are not impressed with this argument. The policy does not postpone the duty to notify until the insured has information from which it may believe itself liable but only until the insured has information that a claim may involve the Lexington policy if the insured is liable. Lexington conceded, and we agree, that HUP must have some grounds for believing its liability at issue. But, at the latest, HUP was aware of that potential when Mrs. Soppe filed her suit in February, 1983.
 
 
 21
 HUP also claims, however, that it was not aware that Mrs. Soppe's claim would implicate the Lexington policy until HUP received Mrs. Soppe's damage evaluation, claiming damages of five to ten million dollars, in early December, 1983. There was testimony in the record that as late as November, 1983 HUP's seasoned and capable trial counsel believed the case would settle for around $1.5 million. In that event Mrs. Soppe's claim would not have implicated Lexington's coverage. If the jury credited this testimony, it had reasonable grounds for believing that the duty to notify did not commence until soon before the actual, December, 1983 notice. As we have intimated, the jury also had grounds for believing that HUP's duty to notify commenced months, even years, before this date. In view of the conflicting testimony, however, we believe the issue of late notice was properly a question for the jury.
 
 
 22
 Lexington next claims that the district court improperly instructed the jury regarding the meaning of late notice under the policy. The district court's instructions on the meaning of the policy were as follows:
 
 
 23
 [T]he policy provides that the notice of the potential claim is to be given only when the insured reasonably believes that a claim might involve Lexington's coverage. Not that a claim has been made, but only in the event that it's going to involve Lexington. Thus, it leaves that determination of the potential value to the insured, not to the insurance company.
 
 
 24
 As I mentioned earlier, Lexington then has the burden of proving by a preponderance of the evidence that the Trustees of the University and its agents had no reasonable basis for their doubt that the claim of Estelle Soppe would reach the insurance provided by the Lexington policy.
 
 
 25
 (emphasis supplied).
 
 
 26
 Construction of an insurance policy, like construction of any contract, is a matter of law so long as a court may fairly read it without ambiguity. Ram Construction Co., v. American States Ins. Co., 749 F.2d 1049, 1052-53 (3d Cir.1984); cf. Cooper Lab. v. International Surplus Lines Ins. Co., 802 F.2d 667, 671 (3d Cir.1986) (distinction between law and fact in contract case is matter of federal law). We believe that the district court's instruction was in error.
 
 
 27
 Despite the policy's tortured phrasing, it unambiguously sets out an objective standard for the time at which notice was required. The policy required notice whenever the Insured had information from which it might "reasonably conclude" that an occurrence was "likely to involve" the policy. Exactly what this "may reasonably conclude" language required is somewhat unclear. Arguably it required notice if any insured could reasonably have concluded that the occurrence would involve the policy--although we consider the significance of the term "may" sufficiently ambiguous to preclude such an onerous interpretation. We do believe, however, that the policy required notice at least if the insured, acting on the basis of the knowledge HUP possessed at the time, should have believed that the incident was likely to involve the policy if it had considered the matter reasonably. Thus we hold that the policy imposes an objective standard.
 
 
 28
 Under this formulation, the jury instruction was in error for two reasons. First, it informed the jury that the determination whether to notify was left entirely to HUP when in fact HUP had an obligation to notify Lexington if the information reasonably required it. Second, the instruction told the jury that if HUP had any reasonable basis for doubting that Mrs. Soppe's claim would reach the Lexington coverage, it had no obligation to notify. In fact, HUP had the obligation to notify whenever reasonable judgment, based on the information available to HUP, suggested that the claim was likely to involve Lexington. HUP could have this obligation to notify despite many reasonable doubts that the claim would actually involve Lexington's coverage.
 
 
 29
 Although the district court quoted the actual language of the policy to the jury, we do not believe that doing so corrected these two errors. The construction of an unambiguous policy is for the court; the district court construed it but did so erroneously. Moreover, the jury possessed abundant evidence from which it could have concluded that notice was late if it had received a proper instruction.
 
 B. Prejudice
 
 30
 1. Notwithstanding the incorrect jury instruction on late notice, we may not order a new trial unless Lexington demonstrates prejudice from the late notice. In Brakeman v. Potomac Ins. Co., 472 Pa. 66, 371 A.2d 193 (1977), the Pennsylvania Supreme Court held that late notice will only release an insurance company from its obligations under a policy if it can prove actual prejudice. Lexington claims, however, that the rationales provided by the court in Brakeman make its holding inapplicable to the present case.
 
 
 31
 First, claims Lexington, Brakeman hinged on the automobile insurance context in which it arose. According to Lexington, Brakeman turned on the view that the legal obligation to carry automobile insurance removed the element of free will in normal contractual relationships. Lexington further asserts that the Brakeman court relied on the strong public policy, expressed by Pennsylvania's no-fault insurance law, in favor of compensating victims of automobile accidents. In contrast, Lexington points out that this case involves no automobile claims and a victim who will, at all events, be substantially compensated by a financially responsible defendant, HUP.
 
 
 32
 Brakeman certainly turned in part on the Pennsylvania Supreme Court's view that most insurance contracts are not negotiated agreements but rather are dictated by the insurance company in all matters but price. 371 A.2d at 196. The Brakeman court also discussed the policy favoring compensation of tort victims. 371 A.2d at 198. Although the court noted the particular strength of these arguments in the automobile context, see id. at n. 8., the court discussed both kinds of reasoning in general terms, and its discussion applies outside of the automobile context. Pennsylvania courts have already applied the Brakeman rule to other kinds of insurance contracts. See, e.g., Judge v. Celina Mut. Ins. Co., 303 Pa.Super. 221, 449 A.2d 658 (1982).
 
 
 33
 Second, Lexington contends that the Brakeman rule should apply only to policies between insurance companies and unsophisticated consumers, situations involving unequal bargaining power and contracts of adhesion. Lexington notes by analogy that the rule requiring strict construction of insurance language against the insurer does not apply to negotiated contracts between the insurer and sophisticated corporations. Eastern Associated Coal Corp. v. Aetna Casualty & Sur. Co., 632 F.2d 1068 (3d Cir.1980). In contrast, claims Lexington, the insurance policy at issue in this case was the subject of significant negotiations between sophisticated parties, evidenced in part by the fact that HUP acts as self-insurer for the first $100,000 of coverage and assumes all of the duties and responsibilities of a primary insurer.[1] In Compagnie des Bauxites de Guinee v. Insurance Co. of North America, 724 F.2d 369, 374 (3d Cir.1983), we noted without resolving the question that the Brakeman rule might not apply to an insurance contract between sophisticated parties.
 
 
 34
 Obligated now to predict how Pennsylvania would decide the question raised in Compagnie des Bauxites, we determine that the Brakeman rule applies even to policies between sophisticated parties.[2] Although a sophisticated consumer has greater power and experience with which to negotiate individual terms of an insurance policy, we believe Brakeman rested above all on the court's unwillingness to permit a forfeiture of insurance protection "unless a sound reason exists for doing so." 371 A.2d at 197. The court stated:
 
 
 35
 The purpose of a policy provision requiring notice of an accident or loss to be given within a certain time is to give the insurer an opportunity to acquire, through an adequate investigation, full information about the circumstances of the case, on the basis of which, it can proceed to disposition, either through settlement or defense of the claim....
 
 
 36
 Thus, a reasonable notice clause is designed to protect the insurance company from being placed in a substantially less favorable position than it would have been if timely notice had been provided, e.g., being forced to pay a claim against which it has not had an opportunity to defend effectively.... Where the insurance company's interests have not been harmed by a late notice ... the reason behind the notice condition in the policy is lacking, and it follows neither logic nor fairness to relieve the insurance company of its obligations under the policy in such a situation.
 
 
 37
 371 A.2d at 197 (citations omitted). The Brakeman court's determination not to permit forfeiture in the absence of good reason mandates that we require Lexington to show prejudice despite HUP's relative sophistication.
 
 
 38
 Finally, Lexington claims that excess insurance policies lie outside the Brakeman rule. We believe, however, that the excess insurance context presents an even more compelling reason to require prejudice. Unlike primary insurers, excess insurers have no right to control a lawsuit and thus have less need for early notice. Moreover, because primary insurers will usually provide an experienced defense, the likelihood of prejudice from late notice is more remote.
 
 
 39
 2. Although the district court correctly instructed the jury that Lexington must demonstrate prejudice in order to escape liability, the jury never answered the interrogatory regarding prejudice because it found HUP's notice to have been timely. Despite that fact, we are bound to uphold a jury verdict if the jury necessarily decided the relevant issues in reaching its verdict. See Peil v. Speiser, 806 F.2d 1154 (3d Cir.1986).
 
 
 40
 In this case, Lexington has presented several theories of prejudice. Generally, Lexington argues that the lateness of the notice in and of itself prejudiced Lexington because the insufficiency of time between notice and the trial date deprived Lexington of its "rights under the policy ... [to] associate in the defense and control of the suit." In addition, Lexington claims prejudice on four more specific grounds. The first three were presented in the original telegram of disclaimer to HUP on February 18, 1984. See supra at 894 (unspecified "gross mishandling," failure to explore liability against alternative defendants or insurers, failure to prosecute cross-claims because of conflict of interest). At trial Lexington also argued that the late notice deprived it of sufficient time to obtain an expert who would testify about Mrs. Soppe's reduced life expectancy. Lexington claims that Mrs. Soppe injuries reduced her life expectancy and limited the settlement value of the claim by shortening the period in which Mrs. Soppe would need medical care or other services. To support this claim, Lexington notes the testimony of its expert, Dr. A.R. Moosa, who stated that Mrs. Soppe would probably live no more than five years and almost certainly would not live to the end of her normal life expectancy. Although Lexington introduced this testimony at trial, it did so only in support of its claim that the Soppe settlement was unreasonable, not that late notice had prejudiced Lexington's interests.[3]
 
 
 41
 Taking these claims in order, we do not agree that Lexington's general claim of prejudice can satisfy the Brakeman requirement. Although our survey of Pennsylvania law does not reveal any clear explanation of the meaning of prejudice, Lexington's view would make the lateness of notice itself a form of prejudice, for late notice almost invariably interferes with the insurer's procedures for processing a claim. But the purpose of the prejudice requirement is to allow an insurer to refuse payment only if its procedural handicap has led to disadvantageous, substantive results--in other words, if the insured's violation of its contract has proximately caused its insurer damages. As a New Jersey Superior Court decision has cogently explained, courts have required a showing not only of the loss of substantial defense opportunities but also of a "likelihood of success" in defending liability or damages if those opportunities had been available. Morales v. National Grange Mut. Ins. Co., 176 N.J.Super. 347, 423 A.2d 325 (Law Div.1980). Indeed, such a requirement makes particular sense in cases involving excess coverage because excess carriers generally have no right to control a lawsuit and because notice to the primary carrier generally ensures a competent and intelligent defense. The mere interference with Lexington's right to "associate" in the defense of the claim is too amorphous and cannot itself constitute prejudice unless Lexington can demonstrate that earlier notice would probably have led to a more advantageous result.
 
 
 42
 Regarding the remaining theories of prejudice, we must determine if the jury necessarily rejected them. The jury did not make an explicit finding on prejudice in its answers to the various interrogatories. The jury did, however, consider Lexington's first three claims of prejudice in its verdict on punitive damages. The district court instructed the jury that in order to award punitive damages, it must find "that the insurance company disclaimed well knowing that they didn't have any real grounds for it, and that [the grounds of prejudice] put in this letter of ... February 17 [sic 18] were merely a pretext in order to avoid their obligation under the contract...." In awarding punitive damages, the jury therefore not only rejected Lexington's first three claims of prejudice but also found them utterly without basis. This decision had an abundant evidentiary basis.
 
 
 43
 Lexington's prejudice claim based on Mrs. Soppe's reduced life expectancy is more problematic. Lexington claims that the mere lack of time in which to obtain an expert between the date of notice and the trial date constitutes prejudice.[4] In accordance with our view that prejudice requires a showing that the lateness of notice probably altered the result, we believe that Lexington must prove more. Lexington neither provided HUP's defense nor had a right to do so under the policy. Thus, in order to demonstrate damages, Lexington must show at least that with proper time it probably would have found an expert to testify about Mrs. Soppe's reduced life expectancy and that the availability of this testimony probably would either have dissuaded HUP from accepting Mrs. Soppe's settlement demand or would have made the acceptance of such a demand unreasonable.[5]
 
 
 44
 We assume arguendo that the late notice deprived Lexington of sufficient time to find a life expectancy expert and that Lexington proved that it could probably have obtained such an expert by procuring the testimony from Dr. Moosa for this trial. We believe, however, that the jury rejected the claim that the availability of Dr. Moosa's testimony would or should have altered the settlement. While instructing the jury on the issue of the settlement's reasonableness, the district court put the burden of proof on HUP and charged specifically about the implications of the testimony on reduced life expectancy:
 
 
 45
 Lexington contends had this case been handled properly by the agents of the Hospital, that is, the law firm, that they would have gotten somebody to say that Mrs. Soppe's life expectancy was something less than the normal life expectancy. You are to decide whether or not under all the circumstances this would be the case and what impact or what effect that would have on the settlement negotiations in any event. You have a divergence of view among the experts. I guess in order to answer that question, you would have to place yourself in the seats of the jury who was going to hear the Soppe case and determine whether or not under those circumstances the verdict would then be anything less than $7 million.
 
 
 46
 In light of this instruction, the jury's finding that the settlement was reasonable represents a rejection of the theory that testimony such as Dr. Moosa's should have been procured and would have resulted in a lower settlement.
 
 
 47
 The jury's findings on punitive damages and the reasonableness of the settlement necessarily required the jury to reject Lexington's grounds for prejudice. These findings were supported by substantial evidence. Accordingly, the district court's incorrect instruction on late notice was irrelevant, and we uphold the jury determination that HUP did not forfeit the protection of Lexington's excess policy in this case.
 
 III. THE TWO-TIERED SETTLEMENT
 
 48
 Under the terms of the settlement with Mrs. Soppe, HUP and the CAT Fund paid the initial $2.15 million in accordance with the first two levels of insurance. HUP paid $100,000 on behalf of HUP and $100,000 on behalf of Dr. Trotman, and the CAT Fund paid $1 million on behalf of each. HUP then agreed to pay an additional $4.8 million only if HUP was successful in its suit against Lexington; otherwise HUP would pay an additional $2.1 million and would cover Mrs. Soppe's lifetime medical expenses. Because the policy applies only to losses "which the Insured shall become legally obligated to pay," Lexington claims that it need only assume the costs assumed by HUP and not the additional $4.8 million necessary to make up the $7 million settlement.[6]
 
 
 49
 Courts have differed over the permissibility of two-tiered, or "conditional," settlements where the insurance company has improperly denied coverage. Some courts have construed "legally obligated" language strictly and have refused recovery for the upper tier. See Stubblefield v. St. Paul Fire & Marine Ins. Co., 267 Or. 397, 517 P.2d 262 (1973); Huffman v. Peerless Ins. Co., 17 N.C.App. 292, 193 S.E.2d 773, cert. denied, 283 N.C. 257, 195 S.E.2d 689 (1973). To the same effect, other courts have argued that recovery of the upper tier should be impermissible because the insured's lack of incentive to limit any recovery for which it cannot be liable eliminates the likelihood of reasonableness. See Hitt v. Cox, 737 F.2d 421, 426 (4th Cir.1984) (applying Virginia law); Tidex, Inc. v. A.L. Commercial Blasting Corp., 567 F.Supp. 918, 923-24 (E.D.La.1983) (apparently applying Louisiana law). As the court stated in Hitt:
 
 
 50
 Once it agreed to settle by paying Hitt $350,000, it had no incentive to avoid an agreement to pay an additional $150,000 if Harleysville was found liable to indemnify. In this situation, the negotiating parties no longer have adverse interests, and their conditional settlement is presumptively unreasonable.... To allow the [insured] full recovery in this case would set a precedent allowing any insured left to defend himself not only to settle at a reasonable amount, but to give away an additional amount up to the liability limit of this policy conditional on a successful indemnity suit against the insurance company. (emphasis in original)
 
 
 51
 In contrast, several courts have held that "an insurer may not hide behind the 'legally obligated to pay' language of the policy after it abandons its insured." American Family Mut. Ins. Co. v. Kivela, 408 N.E.2d 805, 813 (Ind.App.1980). These courts have reasoned that where an insurer abandons its obligation to defend despite proper notice, the insurer must be responsible for its share of the settlement absent fraud or collusion. See Coblentz v. American Sur. Co. of N.Y., 416 F.2d 1059 (5th Cir.1969) (applying Florida law); State Farm Mut. Auto. Ins. Co. v. Paynter, 122 Ariz. 198, 593 P.2d 948, 953 (Ct.App.1979); Metcalf v. Hartford Accident & Indem. Co., 176 Neb. 468, 126 N.W.2d 471 (1964).
 
 
 52
 The Pennsylvania cases are inconclusive. Lexington points to Dennis v. New Amsterdam Casualty Co., 216 Pa.Super. 320, 264 A.2d 436 (1970), which involved a suit by an insured against its insurer for indemnification of the insured's settlement obligations. Under the settlement, the insured agreed to pay $1,000 but to sue his insurer for the $17,500 on behalf of the original plaintiff.
 
 
 53
 The Superior Court refused recovery principally on the grounds that the original suit involved claims subject to workmen's compensation excluded by the policy. In the portion of its opinion relevant to this case, the court added, without elaboration, that recovery must be denied "also because under the settlement agreement, Dennis is not obligated to pay the same, this being a secondary and minor consideration." 264 A.2d at 439.
 
 
 54
 In response, HUP cites Alfiero v. Berks Mut. Leasing Co., 347 Pa.Super. 86, 500 A.2d 169 (1985), which bears many similarities to this case. As in this case, Alfiero involved a personal injury suit settled by the insured with approval of its primary insurer despite the disclaimer of the excess carrier. Accompanying the settlement, the insured assigned its interests against its insurer to the original plaintiff in return for the plaintiff's promise not to expose the insured's assets to sale to satisfy the settlement. The excess insurer claimed that it was not liable because the agreement protecting the insured's assets extinguished the insured's liability and therefore its own. The court disagreed, reasoning that once the insurer had breached its contract of insurance, the insured could proceed to "negotiate a settlement in an amount that was fair and reasonable.... The settlement was not unreasonable merely because Berks sought to protect the assets which it used in conducting business." 500 A.2d at 172 (citations omitted).[7]
 
 
 55
 Neither Dennis nor Alfiero disposes of the issue in this case. The language in Dennis, although directly on point, was at most an alternative holding. It was so offhand and self-consciously "minor" that we cannot consider it controlling authority. In contrast, the language in Alfiero is more deliberate and reasoned. But the insured in that case did not escape all liability for the sum the insurer became obligated to pay. Protection of its assets from sale would not prevent satisfaction of the judgment from income.
 
 
 56
 Despite the fact that neither case conclusively controls, we consider Alfiero more apposite, as well as more reasoned, and hence a better prediction of the views of the Pennsylvania Supreme Court. The reasoning in Alfiero was that once the insured had repudiated its contract of insurance, its insured must be allowed to negotiate a settlement that protected the interests for which it purchased insurance--in that case, the threat that an accident would put it out of business. The court apparently believed that the obligation that the settlement be "reasonable" and "in good faith" provided sufficient protection for the interests of the insured.
 
 
 57
 The facts of this case are less compelling for HUP than they were for Alfiero: Lexington's misconduct was less reprehensible than that of the insurer in Alfiero; no evidence suggests that failure to protect HUP from this judgment would cause HUP to go out of business; and this agreement exempts HUP completely from liability for part of the settlement instead of merely protecting assets. We do not believe, however, that Pennsylvania would recognize a rule based on degree of need.
 
 
 58
 Insurance policies are risk-spreading devices. They exist primarily because the stakes of liability to an insured are greater than they are to the insurer, which can spread the loss across all of its customers. The impact of a settlement offer may be sufficiently great on an insured that it must risk the hazards of even greater liability after trial despite odds that make the settlement advantageous. Prohibiting two-tiered settlement may therefore force insureds to turn down advantageous settlement offers. This, apparently, is the policy rationale accepted by Alfiero, and we consider Alfiero the most persuasive indication of the position of Pennsylvania law.
 
 
 59
 We are not unmindful of the dangers presented by two-tiered settlements. At the margins, a settlement's good faith and reasonableness may be hard to disprove. In a settlement of the magnitude of this case, the insured will have an incentive to bargain down a few hundred thousand dollars of its own potential liability in return for several hundred thousand dollars extra potential liability for the insurer. Perhaps, for this reason, a trial court might properly instruct the jury that two-tiered settlements are fraught with the danger of self-dealing and should be scrutinized with extra care. And perhaps Pennsylvania courts might require insureds to meet a more onerous burden of proof when demonstrating the reasonableness of those portions of the settlement applicable only to the insurer, e.g., clear and convincing evidence.[8] However, no such issue is before us. We also note that an insurance company will face this problem only if it improperly disclaims.
 
 
 60
 In sum, we believe that Pennsylvania would uphold the validity of two-tiered settlements such as the one at issue here, subject to the requirements of good faith and reasonableness. We turn to the question of the good faith and reasonableness of the upper tier.
 
 IV. REASONABLENESS OF THE SETTLEMENT
 A. Sufficiency of the Evidence
 
 61
 Lexington claims that the district court erred in refusing to direct a verdict for Lexington at the close of HUP's case in chief because HUP had failed to meet its burden of proving that the Soppe settlement was reasonable. The district court instructed the jury that HUP had the burden of proving that the settlement was reasonable and in good faith.[9] Lexington claims that HUP failed to meet its burden as a matter of law because it failed to introduce sufficient facts about the actual Soppe case to demonstrate the reasonableness of the settlement.
 
 
 62
 We believe that the jury had sufficient evidence to find the settlement reasonable simply on the basis of the statement of Lexington's claims examiner, Paul Cote. Cote characterized Mrs. Soppe's injuries as "catastrophic" and admitted that HUP and Dr. Trotman were in a defenseless position. Cote also commented that the potential jury verdict could have amounted to "$7 million to 10, 12 million," stating that "in essence the sky was the limit."
 
 
 63
 In addition, HUP's defense counsel engaged a consultant, David Kurkowski, who organized a mock jury simulation. The mock jury panel returned a verdict of $10 million in favor of Mrs. Soppe, with some jurors indicating a willingness to award a substantially higher amount, and evidence of this result was introduced. Lexington deprecates the value of this evidence because the simulation involved a reading of facts by counsel rather than simulated testimony and because Dr. Kurkowski did not know, when asked, what constituted a typical demographic background of a Philadelphia Common Pleas jury. However, the mock trial evidence was probative, and if credited by a jury, it provided ample evidence from which the jury could conclude that the settlement figure of $7 million was reasonable.
 
 
 64
 Lexington contends that neither Cote's nor Kurkowski's testimony may support the district court's denial of the motion for a directed verdict because the jury only received this testimony during the course of Lexington's defense. Lexington made its original Rule 50 motion at the close of HUP's case in chief, and Lexington claims that HUP cannot buttress the district court's denial of the motion at that time by evidence available only afterwards.
 
 
 65
 Lexington's claim is without merit. By proceeding to offer evidence in its own defense, a defendant waives the right to a directed verdict. If the motion for directed verdict is renewed at the close of all the evidence, the court will decide it according to the record as it then stands. Peterson v. Hager, 724 F.2d 851 (10th Cir.1984); 9 J. Wright & A. Miller, Federal Practice and Procedure Sec. 2534 (1971) (initial error by district court "is cured if subsequent testimony on behalf of the moving party repairs the defects of his opponent's case"); 5A J. Moore & J. Lucas, Moore's Federal Practice p 50.05 (2d ed. 1986) (same). Accordingly, any defects in HUP's case in chief were cured by evidence adduced during Lexington's defense.
 
 
 66
 B. Evidentiary Rulings and Jury Instructions
 
 
 67
 Assuming that the issue of the settlement's reasonableness properly went to the jury, Lexington claims that improper evidentiary and procedural rulings nevertheless require a new trial.
 
 
 68
 First, Lexington claims that the district court improperly excluded expert testimony by Carol Strickland, the claims examiner assigned to the Soppe case by the CAT fund. Ms. Strickland had been a claims examiner for four and one half years with the CAT Fund and had handled approximately 500 claims. In her deposition Mrs. Strickland stated that the potential jury verdict was only between 2 and 2.5 million dollars, so a seven million settlement was unreasonable.
 
 
 69
 The district court refused to permit Ms. Strickland to testify about her evaluation of the potential jury verdict and excluded Ms. Strickland's written evaluation in her recommendation to the CAT Fund. The court also refused testimony regarding Ms. Strickland's opinion of the settlement eventually made. In doing so, the court relied heavily on the fact that Mrs. Strickland was not a lawyer and thus could not be familiar with the myriad factors that might influence a potential jury verdict.
 
 
 70
 A district court has broad discretion to determine the qualifications of an expert. Universal Athletic Sales Co. v. American Gym Recreational & Athletic Equipment Corp., 546 F.2d 530, 537 (3d Cir.) cert. denied, 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1976); 3 Weinstein & Berger, Weinstein's Evidence p 702, at 702-22 & nn. 4-5 (1985). Although we do not believe that only lawyers are qualified to comment on a claim's reasonable settlement value, we cannot say that the district court abused its discretion in this case. Strickland had had several years experience as a claims adjuster, but she was not shown to have any experience with claims approaching the magnitude presented by this case.
 
 
 71
 Lexington also challenges the district court's instructions to the jury about how it might consider statements admitted through transcripts of the state court settlement hearings. The district court admitted the transcript of the settlement hearings of April 4 and 5, 1984, at which HUP, Mrs. Soppe and Dr. Trotman presented the terms of the settlement. In that hearing the attorneys and Judge Goodheart made many statements that the settlement was reasonable.[10] The district court also admitted the transcript of May 17 hearing, at which the Deputy Attorney General of Pennsylvania[11] expressed his view that the settlement was wise and in the best interests of HUP.
 
 
 72
 The district court approved the reading of the transcripts largely on the grounds that the oral presentation to Judge Goodheart constituted the fullest representation of the terms of the settlement. In accordance with objection by Lexington's counsel, the district court agreed that the testimony in the transcripts would not be admissible to prove the reasonableness of the settlement. In its opinion denying Lexington's motions for judgment n.o.v. and for a new trial, the district court further stated that the transcripts "were admissible not to prove the truth of the matter asserted, that in fact the settlement was reasonable, but were admissible merely to show what was presented in open court, an act of independent legal significance."
 
 
 73
 Despite these statements, the district court later permitted HUP's counsel to state during closing argument that Judge Goodheart approved the settlement as being fair and reasonable. The district court also told the jury:
 
 
 74
 You may take into consideration the fact that the Judge approved the settlement in a presentation in open court; the fact that Lexington did not object to it until after the present action was filed.... You may take into consideration the lawyers' opinions that are involved in the underlying action, their views as to whether or not it was a fair settlement. You may take that into consideration.
 
 
 75
 Later, the district court heightened its instruction regarding the testimony of the lawyers during the Soppe proceeding:
 
 
 76
 I remarked about the settlement proceedings before Judge Goodheart. I just want to add I did say that you can take into consideration the lawyers' view, that is, the lawyers involved in the Soppe litigation, their view of the fairness of the settlement, whether it was reasonable. Their views are entitled to great weight and you can take that into consideration.
 
 
 77
 Lexington objects that the district court erred in its use of the settlement hearing transcripts and particularly in permitting the jury to consider the opinion of Judge Goodheart that the settlement arrived at between Mrs. Soppe and the health care providers was reasonable. We agree that the district court partially erred. We do not doubt that the district court properly admitted the transcripts of the April 4th and 5th hearings before Judge Goodheart to indicate the content of the settlement agreement. Furthermore, because Lexington never sought to redact the transcript to exclude the alleged hearsay elements, the admission of Judge Goodheart's statement and the statements of counsel was proper. However, we disagree with the court's admission of the May 17 transcript containing the Deputy Attorney General's statements as well as the uses permitted of Judge Goodheart's statements and the statement of counsel in the April 4th and 5th hearings.
 
 
 78
 We first consider the statements of counsel for Soppe and HUP during the Soppe settlement proceedings. The district court properly admitted the April 4th and 5th transcripts to prove the content of the settlement because the mere fact that these assertions were made would itself "affect the legal rights of the parties." Fed.R.Evid. 801, advisory committee's note. To the extent that the statements of counsel purport to demonstrate that the settlement was reasonable, however, or even that counsel believed it was reasonable, the statements were classic hearsay. Although the views of HUP's counsel may have been entitled to and accorded great weight in the Soppe litigation, and may also be highly probative here, those views cannot be put into evidence through out-of-court statements not subject to cross-examination. Indeed, these statements illustrate the purposes of the hearsay exception, for counsel made these statements after initiation of the Soppe litigation with the strong self-interest in demonstrating the settlement's reasonableness.
 
 
 79
 We also believe that the district court erred in its instructions about Judge Goodheart's statement and in its admission of the statements of the Deputy Attorney General. HUP offers no justification for admission of the May 17th hearing transcripts containing statements of the Deputy Attorney General. The hearing occurred solely for the Deputy to make his statement. With regard to Judge Goodheart's statements, although at first blush they might appear to have some independent legal significance, we cannot, upon analysis, identify any such basis for their admission in the Federal Rules of Evidence.
 
 
 80
 HUP attempts to justify the admission of Judge Goodheart's statements on the ground that they indicate Judge Goodheart's state of mind toward the settlement and were accordingly admissible under Fed.R.Evid. 803(3). But Judge Goodheart's statements went far beyond communicating his state of mind, and the district court permitted their use for more than that purpose. The essence of the state of mind exception is that there are circumstantial guarantees of trustworthiness attendant to a statement that reflects a then existing mental, emotional or physical condition such as intent, plan, motive, design, mental feeling, pain or bodily health. The rule explicitly does not encompass a statement of memory or belief, and, fairly read, it does not contemplate the kind of reflective judicial pronouncement that is subsumed within a statement that a settlement is "fair and reasonable." See Rule 803(3) advisory committee's note (state of mind exception is specific example of Rule 803(1) exception for present sense impression).
 
 
 81
 HUP also seeks to justify the admission and use of these statements through an ambiguous reference to Rule 803(8). Although the Ninth Circuit has applied the rule to admit a transcript of a former proceeding, United States v. Arias, 575 F.2d 253, 254 (9th Cir.), cert. denied, 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978), it did so only to prove that testimony and an oath were given; the statements given were not admissible to prove truth of the matter asserted. Admission of prior testimony through a court transcript, merely because the testimony was observed and recorded pursuant to duty imposed by law, would emasculate large portions of the hearsay rule. The advisory committee's note to Rule 803(8) cites with approval the case of Wong Wing Foo v. McGrath, 196 F.2d 120, 123 (9th Cir.1952), which held that a transcript of a former proceeding is not admissible under the government records exception to prove the truth of matters asserted by a witness quoted therein.
 
 
 82
 Neither does Rule 803(8)(C) apply to the statements of Judge Goodheart. Rule 803(8)(C) specifically refers to factual findings resulting from "an investigation made pursuant to authority granted by law," and the advisory committee's note focuses specifically on the findings of officials and agencies within the executive branch. Neither the advisory note nor the leading treatises make even the remotest reference to judicial findings. See, e.g., McCormick on Evidence Sec. 316, at 890 (E.W. Cleary, ed., 3d ed. 1984); J. Weinstein & M. Berger, 4 Weinstein's Evidence p 803(8) (1985). Furthermore, Rule 803(8)(C) requires the district court to determine if the "source or other circumstances indicate lack of trustworthiness." Because a trustworthiness evaluation might involve calling the author of the fact-finding or his staff members to permit parties to impeach their work, the need for judicial confidentiality makes judicial findings unsuitable for this scrutiny. Finally, the general rule is that judicial findings are inadmissible against a party not present in the prior litigation. See McCormick on Evidence supra, Sec. 318, at 893-94; V.J. Wigmore, Evidence Sec. 1671a (Chadbourn rev. 1974). HUP's reading of Rule 803(8)(C) would contradict that rule, yet HUP has offered no indication that courts have altered their practice, nor do we believe that they should.
 
 
 83
 Even if Rule 803(8)(C) did apply to judicial findings, however, use of Judge Goodheart's statements would still be impermissible. The statements do not appear to constitute true judicial findings, for there appears to have been no warrant or authority for Judge Goodheart to approve the settlement. Even if there were, Judge Goodheart indicated that he judged the fairness of the settlement only from the standpoint of "three parties," apparently referring to Mrs. Soppe, HUP, and Dr. Trotman. (The Deputy Attorney General similarly examined the reasonableness of the settlement from HUP's perspective, not from the perspective of Lexington.) Using these statements to prove the reasonableness of the settlement involved the use of bench statements out of context without opportunity for cross examination, implicating many of the dangers the hearsay rule is designed to prevent.
 
 
 84
 A final possibility is Rule 803(24), the so-called residual exception. That rule, however, was not invoked at trial, and we have required some degree of rigor attendant to its invocation. See Zenith Radio Corp. v. Matsushita Elec. Ind. Co., 723 F.2d 238 at 301-03 (3d Cir.1983), rev'd on other grounds, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In any event, the lack of demonstrated legal warrant for Judge Goodheart's approval. Judge Goodheart's explicit lack of focus on the interests of Lexington, and the absence of any party before Judge Goodheart with an interest in challenging the settlement's reasonableness undermine any possible reliance on the residual exception, the touchstone of which is special circumstantial guarantee of trustworthiness.
 
 
 85
 In sum, the transcripts of the April 4th and 5th hearings were admissible to indicate the terms of the settlement, but insofar as the district court permitted the jury to conclude that the settlement was reasonable on the basis of Judge Goodheart's statements, or the out-of-court statements of counsel, it erred. The court also erred in admitting the transcript of the May 17 hearing, for it was conducted solely to present the views of the Deputy Attorney General.[12]
 
 C. Harmless Error
 
 86
 Because we conclude that the district court erred in its admission and instruction of statements made in the state litigation, we must determine whether these errors were harmless. Fed.R.Evid. 103(a) (evidentiary ruling is not reversible error "unless a substantial right of the party is affected"); 28 U.S.C. Sec. 2111 (1982) (appellate court should give judgment "without regard to errors or defects which do not affect the substantial rights of the parties"). This analysis inevitably requires an analysis of probabilities. We must reverse unless we find it "highly probable that the errors did not affect the outcome of the case." McQueeney v. Wilmington Trust Co., 779 F.2d 916, 925 (3d Cir.1985) (setting out standard of review in civil case).
 
 
 87
 We cannot deny in this case that the improper use of the transcript evidence was prejudicial. For a variety of reasons, however, we feel highly confident that exclusion of the evidence would not have changed the result in this case. First, the district court properly admitted the transcript of the April 4th and 5th hearings to prove the content of the settlement. Although doing so did not require admission of the statements about the settlement's reasonableness, Lexington made no request to excise those statements. Therefore, some prejudice may be properly attributed to the failure of Lexington's counsel.
 
 
 88
 Second, one of the counsel who made statements about the reasonableness of the settlement in the Soppe settlement hearing, J. Scott Kramer, testified in the district court that the settlement was reasonable and was subject to cross-examination (on redirect) by HUP. This fact to some degree mitigated the hearsay. In addition, the district court's allusions to the views of HUP's counsel were correct to the extent that they referred to Kramer's testimony.
 
 
 89
 Third, the additional evidence regarding the reasonableness of the Soppe settlement included the admission of Lexington's claims adjuster, Paul Cote, that the potential verdict in the Soppe case ranged from seven to fourteen million dollars. The jury heard evidence of Mrs. Soppe's terrible injuries and lifetime plight. In light of Cote's admission and the additional admission that Dr. Trotman and HUP were defenseless on the issue of liability, the jury had little choice but to find the seven million dollar settlement reasonable.
 
 
 90
 Finally, Lexington had little argument that the settlement figure was unreasonable. HUP's only defense in the Soppe litigation suggested by Lexington related to life expectancy. The district court instructed the jury to put itself in the place of the potential jurors in the underlying case and to decide whether the testimony of Mrs. Soppe's reduced life expectancy would have justified a verdict below $7 million. Assuming the jury followed the judge's instructions and rejected the view advanced by Lexington before upholding the settlement, little if any other evidence in the record would support a finding that the settlement was unreasonable.
 
 
 91
 Based on these factors, we find it highly improbable that exclusion of the erroneously admitted evidence would have altered the jury's view of the settlement's reasonableness.
 
 
 92
 The hearsay evidence may also have influenced the jury's notion of HUP's good faith. Only in the rare case, however, will the insured lack the good faith, or sincere belief, that a settlement is reasonable when the settlement is, in fact, reasonable, and a jury will naturally infer one from the other. Here, no evidence indicates that HUP or its agents lacked the sincere belief that $7 million was a reasonable settlement value for the claim. We therefore believe that the impact of the hearsay evidence on the jury's view of the settlement's reasonableness was harmless so that the district court's erroneous evidentiary rulings were harmless in total.
 
 V. PUNITIVE DAMAGES
 
 93
 Lexington next challenges the jury's award of $500,000 punitive damages based on Lexington's alleged outrageous bad faith. Lexington relies on D'Ambrosio v. Pennsylvania Nat'l Mut. Casualty Ins. Co., 494 Pa. 501, 431 A.2d 966 (1981), where the Supreme Court of Pennsylvania refused to recognize an action for punitive damages where an insurer fails in bad faith and without proper cause to compensate its insured for a loss covered by the policy. Noting that the Pennsylvania legislature had recently created a system of penalties for bad faith conduct in the Unfair Insurance Practices Act, the court reasoned that it was "for the Legislature to determine whether sanctions beyond those created under the Act are required to deter conduct which is less than scrupulous." 431 A.2d at 970.
 
 
 94
 HUP attempts to distinguish D'Ambrosio on the grounds that it involved a claim for payment for injury to the insured, not a claim for indemnification of a third-party claim against the insured. The district court agreed, relying on a Pennsylvania Common Pleas Court decision that followed the same distinction. White v. Erie Indem. Co., 29 Pa. D. & C.3d 453, 457 (1983). Nothing in D'Ambrosio suggests this distinction, however, and Pennsylvania appellate courts have applied the D'Ambrosio rule in third-party contexts. See, e.g., Rodgers v. Nationwide Mut. Ins. Co., 344 Pa.Super. 311, 496 A.2d 811 (1985). We, therefore, reverse the award of punitive damages.VI. PRE-JUDGMENT INTEREST
 
 
 95
 A. The district court awarded HUP prejudgment interest at the statutory rate from the date of the Soppe settlement. Lexington challenges this award in its entirety on the grounds that the Soppe settlement figure does not represent a liquidated amount or a sum ascertainable with sufficient clarity to justify an award of prejudgment interest under Pennsylvania law governing the award of prejudgment interest. Black Gold Coal Corp. v. Shawville Coal Co., 730 F.2d 941, 943 (3d Cir.1984).
 
 
 96
 Pennsylvania courts have generally followed the Restatements on the award of pre-judgment interest. See Penneys v. Pennsylvania R.R. Co., 408 Pa. 276, 183 A.2d 544 (1962) (adopting Sec. 337(a) of the Restatement of Contracts (1937)); Frank B. Bozzo Inc. v. Elec. Weld Div. of Fort Pitt Div. of Spang Ind. Inc., 345 Pa.Super. 423, 498 A.2d 895 (1985) (following Sec. 354(2) of Restatement (Second) of Contracts (1981)). Under Sec. 337(a) of the first Restatement, a party has a right to prejudgment interest for breach of a contract if, among other grounds, the defendant commits a breach of the contract "to render a performance the value of which in money is stated in the contract or is ascertainable by mathematical calculation from a standard fixed in the contract or from established market prices of the subject matter." So long as this standard is met, the amount is considered liquidated. American Enka Co. v. Wicaco Mach. Corp., 686 F.2d 1050, 1057 (3d Cir.1982). Lexington claims that its breach, if any, does not meet this standard because its obligation under the contract was only to pay for the portion of the settlement that was reasonable, and that portion was not certain or liquidated until the decision of the jury in this case.
 
 
 97
 We disagree. The mere fact that parties dispute the amount does not prevent it from being ascertainable by reference to a standard fixed in the contract. American Enka, 686 F.2d at 1057; see also Penneys, 183 A.2d at 545; Oxford Mfg. Co. v. Cliff House Bldg. Corp., 224 Pa.Super. 387, 307 A.2d 343, 345 (1973). Indeed, the mere fact that a jury reduces an amount claimed under a contract does not mean the obligation was previously unliquidated. Oxford Mfg., 307 A.2d at 345. Thus, in J. Purdy Cope Hotels Co. v. Fidelity-Phenix Fire Ins. Co., 126 Pa.Super. 260, 267, 191 A. 636, 640 (1937), the court awarded prejudgment interest against the insurer from the day the insured presented a clear statement of property lost in a fire, notwithstanding a bona fide dispute about the amount of the claim. See also Liberty Mut. Ins. Co. v. Home Ins. Co., 583 F.Supp. 849, 856 (W.D.Pa.1984).
 
 
 98
 Under the standards set out in its policy, Lexington had an obligation to fund its share of the settlement so long as the settlement was reasonable and in good faith. The amount of that obligation became certain with the settlement of the Soppe litigation. The mere fact that Lexington disputed the reasonableness of the settlement does not allow it to escape the obligation to pay interest.
 
 
 99
 Lexington next claims that pre-judgment interest is inappropriate because interest represents compensation "for the deprivation of the use of money" and should be awarded only for such deprivation. Lexington claims that HUP has suffered no such deprivation in this case because, under the terms of its settlement with Mrs. Soppe, HUP must pay over any recovery from Lexington immediately to her.
 
 
 100
 In support of this contention, Lexington cites Schleeter v. Intrieri, 326 Pa.Super. 233, 473 A.2d 1067, 1068 (1984), which contains broad supporting language on the purposes of prejudgment interest. The holding in Schleeter, however, was purely equitable and pragmatic. The court held that delays in the payment of mortgage installments should entitle the mortgage holder only to interest on the late installment payment for the period in which it was late. The lower court, in contrast, had awarded interest on the entire principal merely for delays in the installment.
 
 
 101
 We would agree with Lexington that HUP should not be entitled to interest payments if it were permitted to keep them, for such payments would represent an unjust enrichment. But HUP's agreement with Mrs. Soppe provides for payment of the interest to her, except to the extent the interest represents compensation for the $550,000 HUP has paid and is entitled to recover from Lexington. Under HUP's agreement with Mrs. Soppe, HUP pursues the claim against Lexington in part for Mrs. Soppe's benefit. Under these circumstances, it is proper that Lexington compensate Mrs. Soppe for the time-value of the money improperly withheld her. Cf. Sack v. Feinman, 489 Pa. 152, 413 A.2d 1059, 1064-65 & n. 5 (1980) (court of equity may exercise discretion to award interest where necessary to avoid unjust enrichment).
 
 
 102
 B. Even if Lexington owes prejudgment interest, Lexington asserts that its policy did not obligate it to pay prejudgment interest until the CAT Fund, HUP's underlying insurer, paid its share of the settlement. The policy states:
 
 
 103
 Liability of the Company under this policy with respect to any occurrence shall not attach unless and until the Insured, or the Insured's underlying insurer, shall have paid the amount of underlying limits on account of such occurrence.
 
 
 104
 The CAT Fund did not pay its share of the settlement until December 31, 1984, eight and one half months after completion of the settlement.
 
 
 105
 HUP responds by citing Western & Atlantic Pipe Lines v. Home Ins. Co., 145 Pa. 346, 363, 22 A. 665 (1891). In that case, the Pennsylvania Supreme Court considered an insurer's claim that prejudgment interest should not begin to accrue until after expiration of a sixty day period for payment of claims provided in the policy. The court stated:
 
 
 106
 A sufficient answer to that is: The company denied in toto its liability, and was therefore not entitled to the benefit of the provision in the policy giving 60 days for adjustment and payment of loss.
 
 
 107
 We can find no grounds for distinguishing Western & Atlantic from this case. Lexington claims that the period at issue in Western & Atlantic was an "administrative" period and did not determine the date of insurance exposure; in contrast, claims Lexington, this policy provides that Lexington's exposure does not begin until the underlying insurers have paid. But such a distinction is purely semantic; both provisions provide delay periods before the insurer must pay on liabilities determined at the time of loss or judgment.[13]
 
 
 108
 Because the sixty day period in Western & Atlantic apparently existed to provide an opportunity for adjustment, the court may have reasoned that no such period was necessary where the insurer disclaims coverage completely. If we knew what purpose the payment provision in the present policy served, we might therefore consider the two delay periods distinguishable on some policy ground. But Lexington has offered no purpose for the provision here apart from a generalized assertion that this provision goes to the "essence" of excess insurance coverage. We can therefore discern no basis on which the different purposes of the two provisions might justify different rules and consider Western & Atlantic controlling. Accordingly we will affirm the district court's award of prejudgment interest.
 
 VII. ATTORNEYS' FEES
 
 109
 Finally, Lexington challenges the award of attorney's fees and costs. In making this determination we are again bound by Pennsylvania law. Montgomery Ward & Co. v. Pacific Indem. Co., 557 F.2d 51, 55-58 (3d Cir.1977).
 
 
 110
 Pennsylvania generally follows the "American Rule," which requires each party to pay its own counsel fees in the absence of statutory or contractual obligation or an established exception. Corace v. Balint, 418 Pa. 262, 210 A.2d 882, 887 (1965). In Montgomery Ward, this court predicted that Pennsylvania courts would permit recovery of attorneys' fees incurred by an insured in a declaratory judgment action to establish an insurer's liability to defend the insured if the insurer had refused to defend in bad faith. The Pennsylvania Superior Court, after considerable analysis, has reached the same result. Kelmo Enterprises v. Commercial Union Ins. Co., 285 Pa.Super. 13, 426 A.2d 680, 683-85 (1981). In this case, we must decide whether that exception permits recovery against an insurer if the insurer has no obligation to defend but only an obligation to indemnify.
 
 
 111
 In Kelmo, the Pennsylvania Superior Court started from the established position that an insured may recover the cost of defending a suit against it if the insured breaches its duty to defend. Because the insured contracts for the insurer to assume its defense, recovery of the insured's attorneys' fees in defending the underlying action compensates the insured for the insurer's breach of its express contractual duty to defend. Because recovery of these attorneys' fees is purely a matter of contract, an insured need not show bad faith to prevail.
 
 
 112
 Kelmo extended this position to include the legal costs of establishing the insurer's obligations to defend and to indemnify:
 
 
 113
 [T]he insured has a contract right to have actions against him defended by the insurer, at its expense. If the insurer can force him into a declaratory judgment proceeding and, even though it loses in such action, compel him to bear the expense of such litigation, the insured is actually no better off financially than if he had never had the contract right mentioned above....
 
 
 114
 426 A.2d at 684, quoting 7C J. Appleman, Insurance Law & Practice Sec. 4691 (Berdal ed. 1979). Accordingly, the Superior Court concluded "that it would be anomalous to allow an insured attorneys' fees expended in defense of the underlying tort action but to deny the fees in an action brought to vindicate the contractual duty to defend." 426 A.2d at 684. The Superior Court held, however, that it would permit recovery for these attorneys' fees only if the insurer refused to defend in "bad faith." 426 A.2d at 685.
 
 
 115
 We recognize the strong case for limiting this attorneys' fees exception to matters attendant to the breach of the duty to defend. First, Kelmo and Montgomery Ward speak only of recovery for breach of the duty to defend and they rely on cases that do the same.[14] Second, the origins of the exception lie in the insurer's obligation to pay the legal costs the insurer contracted to assume. The extension of this doctrine to include the costs of suing the insurer seems predicated on the expectation that the insurance contract will insulate the insured from all attorneys' fees. In contrast, the excess insurer here assumed no obligation of defense; in no way do Lexington's express contractual obligations intimate any obligations to protect HUP from legal fees.
 
 
 116
 Notwithstanding the strength of this argument, we believe the better argument supports recovery of attorneys' fees here. Although the Kelmo court purported to connect its holding to a contract analysis, the holding truly rested on a quasi-tort view that attorneys' fees represent compensation for an insurer's violation of its obligation to act in good faith. The mere contractual obligation of the insurer to pay for the costs of defending its insured does not include the obligation to pay for the insured's suit against its insurer. An insured's suit against its insurer is based on the insurance contract, and if the Kelmo court wished to follow the normal Pennsylvania rule that attorneys' fees cannot be reviewed in contract actions, it would have denied recovery. That the Kelmo court permitted recovery suggests that it was motivated not by a contract theory. In addition, the Kelmo court required that the insurer's breach be in bad faith before permitting recovery of attorneys' fees. If the Kelmo court had wished to rely on a strict contract analysis, good faith would not have been relevant.[15]
 
 
 117
 We therefore believe that the essence of the Kelmo decision was the view that attorneys' fees are appropriate only because of the insurer's special obligation to act in good faith. As we have discussed supra, an insurer's disclaimer of coverage may work substantial harm on its insured even if the insured's only duty is to indemnify not to defend. Pennsylvania law recognizes that an insurer has a special obligation to act in good faith not only in performance of its obligation to defend but also in performance of its obligation to indemnify. See Pennsylvania Unfair Insurance Practices Act, 40 Pa.Stat.Ann., Sec. 1171.5(10)(vi) (Pardon Supp.1986) (unfair claim settlement includes "[n]ot attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which the company's liability under the policy has become reasonably clear"). Accordingly, we believe that Pennsylvania law permits HUP to recover its attorneys' fees if Lexington refused to effectuate settlement in bad faith.[16]
 
 
 118
 The district court instructed the jury that it should award attorneys' fees if it found that Lexington acted in "bad faith," and the jury so found. Lexington has not challenged this finding or the jury instructions about what constituted bad faith. We therefore uphold the district court's award of attorneys' fees.[17]
 
 VII.
 
 119
 In summary, the judgment of the district court will be affirmed in part and reversed in part. We will affirm the district court's awards to HUP of Lexington's share of the settlement, of prejudgment interest, and of attorneys' fees. We will reverse the district court's award of punitive damages and remand the case so that the district court can enter a judgment consistent with this opinion.
 
 
 
 *
 The Honorable Garrett E. Brown, Jr., United States District Judge for the District of New Jersey, sitting by designation
 
 
 [1]
 HUP disputes the contention that it negotiated the terms of its policy. Eastern Associated did not make clear which canon of construction a court should apply if only one of the two distinguishing factors--the sophistication of the insured and the existence of negotiation--is present. Because of our belief that application of the Brakeman rule does not depend on the sophistication of the parties, we need not decide whether evidence of negotiation is necessary before a court should apply a strict contractual analysis
 
 
 [2]
 We need not determine whether Pennsylvania courts would enforce an explicit waiver of Brakeman's protection by a sophisticated insured
 
 
 [3]
 HUP has not contended before us that Lexington's failure to articulate this rationale in its disclaimer letter prevents it from relying on this argument now. We therefore need not decide the validity of such a contention, if made
 
 
 [4]
 Lexington did not present testimony that it lacked sufficient time to obtain an expert, but it claims that one of its experts would have testified to this effect had not the district court abused its discretion and prevented this testimony
 
 
 [5]
 We need not decide now whether such prejudice would justify a complete avoidance of insurance coverage or only a reduction of coverage in the amount warranted by the expert testimony
 
 
 [6]
 In its settlement hearing before Judge Goodheart in Pennsylvania state court, HUP's counsel stated that Mrs. Soppe's medical costs should approximate $3.2 million. As far as we can tell, HUP has not relied on such a claim here as proof that the settlement was not truly two-tiered. In any event, a strict application of the policy's "legally obligated to pay" language would obligate Lexington to pay only Mrs. Soppe's medical expenses as they become due, not a lump sum estimate in advance
 
 
 [7]
 HUP also cites Gray v. Nationwide Mut. Ins. Co., 422 Pa. 500, 223 A.2d 8 (1966), but that case is inapposite. In Gray, the insurance company defended the action and lost a judgment in excess of its coverage. In lieu of payment, the insured assigned its rights to the original plaintiff against Gray for breach of its duty to settle in good faith. The court held that this assignment was lawful and did not extinguish Gray 's debt. Both because the insurance company defended the action and because the case proceeded to trial and verdict, the danger that the insured would enter into an unreasonably high settlement was not present in Gray. That is the principal policy concern in this case
 
 
 [8]
 It has not been contested that an insured relying on the two-tiered settlement bears the burden of proof of the reasonableness of the upper tier
 
 
 [9]
 We note that the cases are split about which party should normally bear the burden of proof. Compare D. Wall, Litigation and Prevention of Insurer Bad Faith Secs. 509, 543 (1985) (arguing burden should be on insured and citing cases) with P. Magarick, Excess Liability Sec. 503 (2d ed. 1982 & Supp.1986) (citing cases placing burden of proof on insurer). In this case, HUP does not dispute that it has the burden of proof, so we need not determine the Pennsylvania rule
 
 
 [10]
 Judge Goodheart stated:
 I believe [the settlement] is fair and reasonable to both sides. There are three sides in this case because yesterday I said that the settlement with Dr. Trotman was fair or I approved it, but I agree with and fully endorse and approve of the entire package in this case.
 
 
 [11]
 The Deputy Attorney General stated:
 [W]ith an inspection of the impact of the settlement on the financial viability of the hospital as a charitable institution, I wish to inform the court on behalf of my office that we are satisfied as to the wisdom of the settlement and are satisfied that it is in the best interest of the Hospital of the University of Pennsylvania.
 
 
 [12]
 Lexington makes two other evidentiary contentions, both of which we find without merit. First, Lexington complains that the district court impermissibly permitted HUP to question J. Scott Kramer, HUP's counsel in the Soppe litigation, beyond the scope of direct. We consider the district court's determination to have been well within its broad discretion. See United States v. Adams, 759 F.2d 1099 (3d Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 275, 88 L.Ed.2d 236; --- U.S. ----, 106 S.Ct. 336, 88 L.Ed.2d 321 (1986)
 Second, Lexington complains that the district court impermissibly restricted the testimony of its expert, Laverne Donaldson. We need not consider the merits of this claim, however, because Lexington has pointed to no place in the record in which the district court restricted Donaldson from testifying about the reasonableness of the settlement. The court also prevented Donaldson from testifying about the propriety of two-tiered settlements, but that restriction was proper, for the propriety of two-tiered settlements was a legal issue solely for the court.
 
 
 [13]
 Indeed, Lexington admits that payment by the underlying insurer is not always necessary to trigger Lexington's liability because Lexington would be liable for excess coverage even if the underlying insurer refused coverage after HUP failed to make timely payments
 
 
 [14]
 Kelmo explicitly declined to reach the situation where an insured sues its insurer without the threat of a suit brought by a third party, thus not implicating the duty to defend. 426 A.2d at 685 n. 9
 
 
 [15]
 Further indicating the Kelmo court's special concern with the insurer's obligation to act in good faith, the court cited a case involving Pennsylvania's no-fault automobile insurance statute, 40 P.S. Sec. 1009.107(3), which permits recovery of attorneys' fees where the insurer denies a claim "without reasonable foundation." 426 A.2d at 685 n. 8, citing Hayes v. Erie Ins. Exchange, 261 Pa.Super. 171, 176-77, 395 A.2d 1370, 1373 (1978)
 
 
 [16]
 Lexington argues that different rules for recovery of attorneys' fees should apply to failures to indemnify and failures to defend because, claims Lexington, the duty to defend "amounts to a fiduciary duty" while the duty to indemnify does not. We agree that the actual performance of defending a lawsuit on behalf of the insured carries with it a particularly heavy duty. In such activity, an insurer has the authority to make decisions that control the interests of its insured and has a duty to exercise that authority in accordance with its insured's best interests
 An insurer's breach of its duty to defend by not defending at all, however, does not involve the insurer in making decisions that control the interests of the insured. The breach at that point involves only the failure to provide a service required by contract, a similar kind of breach to the failure to indemnify. The duty of an insurer to provide contractually required services in good faith is the same in either case, and if attorney fees are permissible for a bad faith failure to defend, they should also be permissible for a bad faith failure to indemnify.
 
 
 [17]
 Lexington also claims that we should set aside the award of attorneys' fees because HUP failed to file many of its time records on a weekly basis, as required by the district court's pretrial order. Instead, HUP filed most of its time records on a monthly basis. The district court was satisfied that HUP had maintained the records on a contemporaneous basis and that Lexington was not prejudiced by the monthly filings. We will only interfere with a district court's management of its pretrial order where there is "a clear abuse of discretion." Ely v. Reading Co., 424 F.2d 758, 763-64 (3d Cir.1970). Lexington has offered no argument about how HUP's noncompliance with the trial order prejudiced Lexington's interests. We are satisfied that the district court did not abuse its discretion in accepting HUP's submissions