**GREATER NEW YORK MUTUAL INSURANCE COMPANY**

v.

**NORTH RIVER INSURANCE COMPANY, et al.**

**NORTH RIVER INSURANCE COMPANY**

v.

**GREATER NEW YORK MUTUAL INSURANCE COMPANY.**

Civ. A. Nos. 94–5223 and 94–5554.

United States District Court,
E.D. Pennsylvania,
Civ. Division.

Jan. 18, 1995.

Timothy Costello, Francis J. Deasey, Deasey, Mahoney, Bender & McKenna, Ltd., Philadelphia, PA, for North River Ins. Co., Crum and Forster, Inc., Rodin Management Inc., Crown Park Investors.

James W. Christie, Mary Ellen Nepps, Christie, Pabarue, Mortensen and Young, Philadelphia, PA, for Greater New York Ins. Co.

## MEMORANDUM

BARTLE, District Judge.

These consolidated diversity actions involve a dispute between a primary and an excess insurance company. Before the court are cross motions to dismiss pursuant to Rule 12(b)(6) and to strike pursuant to Rule 12(f) of the Federal Rules of Civil Procedure. Pennsylvania law applies to both cases.

The dispute arises over a complicated settlement of a state court personal injury lawsuit. The settlement was reached after trial and the entry of a $5,796,000 judgment against the companies' insureds. The primary carrier, Greater New York Mutual Insurance Company ("GNY"), seeks to recover the funds it contributed in settlement. It contends that the excess insurer, North River Insurance Company ("North River"), its parent company, Crum & Forster Holdings, Inc. ("Crum & Forster"), and the insured parties, Crown Park Investors and Rodin Management Incorporated (the "insureds") acted wrongfully in structuring the settlement which provides, among other things, for North River to sue GNY in the present action. North River, in its lawsuit, contends that GNY acted in bad faith in failing to settle the case before trial within its $1,000,000 policy limits. North River seeks to impose liability on GNY for the entire amount of the settlement.

A complaint should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure only where "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). All well pleaded factual allegations in the complaint are assumed to be true and are viewed in the light most favorable to the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 1849, 23 L.Ed.2d 404 (1969).

According to the pleadings here, Sandra McIlhenny ("McIlhenny") brought the underlying suit against the insureds in the Court of Common Pleas of Philadelphia County for injuries she suffered when she fell outside a building they owned and managed. Although McIlhenny was allegedly willing to settle within GNY's $1,000,000 policy limits before trial, GNY apparently refused to do so. A jury subsequently awarded McIlhenny $4,000,000 for her injuries. The verdict was molded to add $1,796,000 in delay damages pursuant to Rule 238 of the Pennsylvania Rules of Civil Procedure. Thereafter, GNY filed an appeal to the Superior Court of Pennsylvania on behalf of the insureds. This appeal was withdrawn after North River negotiated, on behalf of the insureds, a settlement agreement with McIlhenny. Shortly before the settlement was reached, GNY tendered McIlhenny its $1,000,000 policy limits.

Pursuant to the settlement agreement, North River paid McIlhenny $1,949,629 and provided her with a lifetime annuity. In return, McIlhenny released North River and the insureds from all further liability. The agreement, however, provides that the "full settlement amount" is $5,250,000. Since the "full settlement amount" is more than the total amount McIlhenny has received from North River and GNY, North River agreed to "exercise its best efforts to recover the full settlement amount ($5,250,000.00) from [GNY] through litigation or other proceedings." If North River prevails, under a formula set forth in the agreement, it would retain the first $1,000,000 and 60% of any amount over that figure. The remaining 40% of the recovered funds would then be paid to McIlhenny. To fund the present litigation, McIlhenny provided North River with $400,-000 of the $1,000,000 she received from GNY.

North River brought suit against GNY in its own right and as the assignee and equitable subrogee of the insureds. North River seeks to recover $4,250,000 from GNY, that is, the stated "full settlement amount" of $5,250,000 minus the $1,000,000 GNY already paid to McIlhenny. If North River succeeds in recovering $4,250,000 from GNY in this suit, the 60%–40% split of these funds with McIlhenny will apparently reimburse North River fully for the amount it has paid her or on her behalf. Before North River brought its lawsuit, GNY filed suit against the North River, Crum & Forster, and the insureds (collectively known as "North River defendants") seeking the return of the $1,000,000 GNY paid McIlhenny on behalf of the insureds.

## I. *The North River defendants' motion to dismiss*

The North River defendants move to dismiss Counts I, II and III of GNY's amended complaint. In Count I, GNY contends that the North River defendants breached "an implied covenant of good faith and fair dealing towards GNY" in negotiating a settlement of the underlying action which requires North River to sue GNY. Count II alleges a civil conspiracy among the North River defendants to injure GNY by means of the settlement.[1] Count III asserts that Crum & Forster "acted in concert with the insureds in breaching the duty owed by the insureds to GNY, and the duty owed by North River to GNY."[2] Finally, the North River defendants have also moved to strike paragraphs

1. In Pennsylvania, a cause of action for civil conspiracy "requires that two or more persons combine or enter an agreement to commit an unlawful act or to do an otherwise lawful act by unlawful means." *Burnside v. Abbott Laboratories*, 351 Pa.Super. 264, 505 A.2d 973, 980 (1985) (citation omitted).

2. The Restatement (2d) of Torts defines the tort of concerted action as follows:
 § 876. Persons Acting in Concert.
 For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

 (a) does a tortious act in concert with the other or pursuant to a common design with him, or
 (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
 (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

77 and 78[3] of the complaint, which seek declaratory relief.

■ The North River defendants correctly note that Count I of GNY's amended complaint hinges on the proposition that they owe a duty of care to GNY. The parties have cited and this court has found no Pennsylvania cases on the issue of whether an excess liability insurer such as North River owes a duty of care to a primary insurance carrier such as GNY. Accordingly, this court must predict how the Pennsylvania Supreme Court would rule if presented with this issue. *See, e.g., Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 364 (3d Cir.1990).

There is, of course, no contractual relationship between North River and GNY on which a duty of good faith owing to GNY may be premised. In the converse situation, the Court of Appeals for the Third Circuit has held that Pennsylvania would reject the theory "of a direct duty running from the primary to the excess carrier." *Puritan Ins. Co. v. Canadian Univ. Ins. Co.,* 775 F.2d 76, 79 (3d Cir.1985), citing *United States Fire Ins. Co. v. Royal Ins. Co.,* 759 F.2d 306, 309, n. 3 (3d Cir.1985). Moreover, the Pennsylvania Supreme Court has ruled that there is no common law cause of action arising in tort for failure to act in good faith in connection with an insurance policy. *See D'Ambrosio v. Pennsylvania Nat'l Mut. Cas. Ins. Co.,* 494 Pa. 501, 431 A.2d 966, 969–70 (1981). On the basis of the *Puritan* and *D'Ambrosio* cases, this court predicts that the Supreme Court of Pennsylvania would decide that an excess insurer owes no direct duty of good faith to a primary insurer. We see no reason why a duty of good faith would run from an excess carrier to a primary carrier when no such duty runs in the opposite direction.

GNY has also sued Crum & Forster, North River's parent company, for breach of a duty of good faith. As Crum & Forster has no contractual relationship with GNY, it, like North River, owes GNY no direct duty. Count I of GNY's amended complaint, alleging breach of such a duty, must be dismissed

insofar as it relates to North River and Crum & Forster.

■ We now turn to the question whether an insured owes a duty of good faith to its insurer. The Pennsylvania courts have not specifically addressed the question. In contrast to the relationship between a primary and an excess carrier, an insurance company and its insured are parties to the same contract. While there are no cases directly on point, various decisions of the Pennsylvania courts on the nature of the duty of good faith in the context of an insurance contract as well as certain statutes provide some guidance on this issue.

A leading case is *Gray v. Nationwide Mutual Insurance Co.,* 422 Pa. 500, 223 A.2d 8 (1966). There, Gray originally sued MacLatchie, Nationwide's insured, as a result of an automobile accident. MacLatchie's policy with Nationwide was limited to $5,000, but Gray obtained a $15,000 jury verdict against MacLatchie. After Nationwide tendered its policy limits, Gray demanded the remainder from MacLatchie. MacLatchie settled with Gray by assigning to Gray all rights MacLatchie had against Nationwide. Gray brought suit alleging that Nationwide had breached an obligation to act in good faith towards MacLatchie in refusing to settle with Gray within its insured's policy limits.

The Supreme Court of Pennsylvania held in *Gray* that an insurance company's obligation to act in good faith towards its insured in deciding whether to settle a claim is implied in the contractual relationship between the parties. *Id.* at 11. Failure to abide by this obligation resulted in a cause of action for breach of contract. *Id.* at 12. The *Gray* court further held that Gray could recover from Nationwide as the assignee of MacLatchie, its insured. *Id.*

In the *D'Ambrosio* case, the Pennsylvania Supreme Court resolved the issue of whether an insured could bring a claim in tort as well as in contract against an insurer for a breach of its duty of good faith. 494 Pa. 501, 431 A.2d at 967. D'Ambrosio brought suit after

---

**3.** The North River defendants incorrectly refer to these paragraph numbers as 76 and 77 throughout their motions. The court will refer to these paragraphs by their correct numbers, 77 and 78, throughout this memorandum.

his insurer refused to pay him first-party benefits for storm damage to his motor boat. D'Ambrosio brought one count in assumpsit seeking contractual damages for the amount allegedly due under his insurance policy. In another count, D'Ambrosio sued in trespass, that is, in tort, seeking punitive damages and damages for "emotional distress" for a breach of the duty of good faith.

The Court of Common Pleas dismissed D'Ambrosio's count in trespass. On appeal, D'Ambrosio relied on California cases which had permitted private plaintiffs to sue their insurers in tort for alleged breaches of their duties under their insurance policies. The Supreme Court of Pennsylvania held there is no cause of action in tort for breach of the duty of good faith. *Id.* at 970. In support of its conclusion, the Court cited Pennsylvania's Unfair Insurance Practices Act ("UIPA"), 40 Pa.Stat. §§ 1171.1–1171.15 (1974). The UIPA authorized the Insurance Commissioner of Pennsylvania to investigate complaints regarding insurance companies and to impose administrative and civil penalties upon its violators. §§ 1171.7–1171.9, 1171.11. Calling UIPA a "legislatively-created regulatory scheme" enacted in a "dramatic, sweeping effort[ ] to curb the bad faith conduct" of insurance carriers, the *D'Ambrosio* court held that UIPA provided the exclusive extracontractual remedy for an insurer's breach of its duty to act in good faith. 431 A.2d at 972.

Both before and after *D'Ambrosio*, Pennsylvania courts consistently refused to permit recovery of punitive damages for a breach of an insurance contract. *See, e.g., Smith v. Harleysville Ins. Co.,* 275 Pa.Super. 246, 418 A.2d 705 (1980), *aff'd,* 494 Pa. 515, 431 A.2d 974 (1981). In 1990, however, the Pennsylvania General Assembly changed the law in this respect when it enacted the hotly debated "no-fault" amendments to the Motor Vehicle Financial Responsibility Law, 75 Pa.Cons. Stat.Ann. §§ 1701 *et seq. See* C. Christopher Hasson et al., Comment, *The 1990 Pennsylvania Auto Insurance Law: An Analysis of "Bad Faith" and the "Limited Tort Option,"* 29 Duq.L.Rev. 619 (1991). The statutory provision in issue, codified at 42 Pa.Cons. Stat.Ann. § 8371, permits an insured to obtain punitive damages "in an action arising under an insurance policy" when the insurer breaches its duty of good faith. This statute, which is not limited to automobile insurance, provides:

§ 8371. Actions on insurance policies

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 Pa.Cons.Stat.Ann. § 8371. While the statute addresses the right of an insured against an insurer, it is silent with respect to any claim an insurer may have against its insured.

The insureds here concede that the *Gray* decision and the "bad faith" statute recognize an implied contractual obligation of an insurance company to act in good faith towards its insureds. However, they argue that they have no reciprocal duty to GNY, their insurer. The insureds contend that the imbalance of bargaining power between the parties precludes the existence of such a duty. GNY, on the other hand, argues that an insurance contract, like any other contractual agreement, gives rise to a reciprocal duty to act in good faith.

GNY relies on § 205 of the Restatement (2d) of Contracts, which states that "[e]very contract imposes upon *each party* a duty of good faith and fair dealing in its performance and its enforcement." (Emphasis added.) Pennsylvania courts have cited § 205 with approval. *See Creeger Brick & Bldg. Supply, Inc. v. Mid–State Bank & Trust Co.,* 385 Pa.Super. 30, 560 A.2d 151, 153–54 (1989). As noted above, Pennsylvania courts have also declared that a contractual common law duty of good faith and fair dealing is implied in insurance agreements, at least running from insurers to insureds. *See, e.g., Dercoli v. Pennsylvania Nat'l. Mut. Ins. Co.,* 520 Pa.

471, 554 A.2d 906, 907–909 (1989), *Gray*, 422 Pa. 500, 223 A.2d at 11; *see also Gedeon v. State Farm Mut. Auto. Ins. Co.*, 410 Pa. 55, 188 A.2d 320, 322 (1963); *Creeger Brick*, 385 Pa.Super. 30, 560 A.2d at 153–54. The "bad faith" statute does not in any way negate GNY's argument. The statute simply provides an insured with an additional remedy of punitive damages not previously allowed in contract actions at common law. The absence of a statutory right of an insurer to punitive damages does not preclude an insurer's claim against an insured for breach of a contractual obligation of good faith with the right to recover whatever common law contract damages, if any, it may have suffered.

This court concludes that Pennsylvania would apply the duty to act in good faith to "each party" to an insurance contract, including the insured. Such a holding is in conformity with the language of § 205 of the Restatement (2d) of Contracts and is not inconsistent with Pennsylvania precedents. Moreover, we can find no cogent reason why such an implied contractual duty should not be reciprocal under an insurance policy. An insured should not have license to act in bad faith toward its insurer. Undoubtedly, the nature and extent of any duty necessarily depends on the specific circumstances involved, and we express no opinion regarding whether the insureds breached any such duty here. At the pleading stage, we cannot say as a matter of law that GNY's insureds have not breached an implied contractual duty to it to act in good faith. Accordingly, the insureds' motion to dismiss Count I must be denied.

 The North River defendants also seek to dismiss Counts II and III of GNY's complaint. Count II alleges that all the defendants engaged in a "civil conspiracy" to injure GNY. This injury is alleged to stem from the defendants' breaches of their purported duties of good faith to GNY in regard to the settlement of McIlhenny's case.

Count III alleges that Crum & Forster and the insureds took "concerted action" to breach their alleged duties of good faith to GNY. Both the civil conspiracy and concerted action theories presuppose that the parties acting or conspiring to act in bad faith must have done so in a tortious manner or to achieve a tortious end. *See* Restatement (2d) of Torts § 876, *Burnside*, 351 Pa.Super. 264, 505 A.2d at 980. In Pennsylvania, breach of a duty of good faith pertaining to an insurance policy sounds in contract, not in tort. *D'Ambrosio*, 494 Pa. 501, 431 A.2d at 972, *Smith*, 275 Pa.Super. 246, 418 A.2d at 706. The right to punitive damages under the "bad faith" statute is allowed in an action "arising under an insurance policy," which is a contract. Accordingly, there is no actionable tort of conspiring or taking concerted action to breach a duty of good faith. All the North River defendants are therefore entitled to dismissal of Counts II and III.[4]

The North River defendants have also moved to strike paragraphs 77 and 78 of Count IV pursuant to Rule 12(f) of the Federal Rules of Civil Procedure.[5] Paragraph 77 requests "a declaration that the settlement negotiated by the defendants violates their duties towards GNY, is excessive and unreasonable, and is unenforceable against GNY." Paragraph 78 seeks "a declaration that it is entitled to be repaid by defendants the entire $1 million paid by GNY to McIlhenny and her counsel." This court has held that North River and Crum & Forster owe GNY no duty. Paragraphs 77 and 78 are thus inapplicable to them as a matter of law. These paragraphs must remain as to the insureds, however, who owe GNY a contractual duty of good faith and fair dealing.

## II. *GNY's motion to dismiss*

North River's suit contends that GNY acted in bad faith in failing to settle McIlhenny's lawsuit within GNY's policy limits before trial. *See Gray*, 422 Pa. 500, 223 A.2d at 11.

---

4. Count III contains no allegations against North River itself.

5. Rule 12(f) provides, in pertinent part, that "upon motion ... the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandal-

ous matter." Presumably the North River defendants base their motion on the alleged immateriality of these paragraphs, which neither set forth a defense nor contain any "impertinent" or "scandalous" allegations.

GNY has filed a motion to dismiss North River's complaint in whole or in part. GNY states in the introduction to its motion that it is entitled to dismissal of North River's entire complaint because the complaint is based on a settlement agreement GNY contends is "tortious and collusive." GNY provides no argument or case law in support of its contention that the entire suit must be dismissed on this basis.

In the alternative, GNY moves to dismiss Counts II, IV[6] and V. North River brings Count II, alleging breach of fiduciary duty, only as the assignee of the insureds. North River brings Counts IV and V, which respectively allege bad faith and request punitive damages, in its own right and as the insureds' assignee and equitable subrogee.

■ GNY argues that Pennsylvania's "bad faith" statute prevents North River, as the assignee or equitable subrogee of the insureds, from asserting common law claims for bad faith, breach of fiduciary duty or entitlement to punitive damages. The Pennsylvania Supreme Court treats the breach of the contractual duty of good faith and breach of fiduciary duty synonymously in the context of insurance cases. *See Gedeon*, 410 Pa. 55, 188 A.2d at 322. There is no common law tort action for bad faith or breach of fiduciary duty. The "bad faith" statute provides the sole remedy for punitive damages for insureds or their assignees or equitable subrogees who allege bad faith or breach of fiduciary duty by an insurer. *See Kauffman v. Aetna Cas. & Sur. Co.*, 794 F.Supp. 137, 139–40 (E.D.Pa.1992). Count II, alleging common law breach of fiduciary duty, must therefore be dismissed insofar as it alleges a tort or seeks punitive damages. The claim of North River alleged in Count V seeking common law punitive damages in its capacity as the insureds' assignee or equitable subrogee must be dismissed on the same basis.

■ Under Pennsylvania law, primary insurers owe no direct duty of good faith to excess carriers. *Puritan*, 775 F.2d at 79, *United States Fire*, 759 F.2d at 309, n. 3. North River therefore has no cause of action

in its own right against GNY for bad faith. Insofar as Counts IV and V attempt to set forth such a claim, they must be dismissed. The bad faith claim alleged in Count IV remains to the extent that North River sues in contract as the insureds' assignee or equitable subrogee.

■ GNY also contends that North River has not sufficiently pleaded a cause of action for punitive damages as the assignee or equitable subrogee of the insureds pursuant to the "bad faith" statute. GNY claims that North River's allegations are insufficient to indicate what conduct is being challenged. This court disagrees. In its own motion, GNY correctly states that the suit is based on its "failure to settle the McIlhenny action before trial ... and allegedly [making an] invalid tender of its policy limits." GNY's motion to eliminate North River's claim to punitive damages as the insureds' assignee or equitable subrogee pursuant to Pennsylvania's "bad faith" statute will be denied.

■ GNY additionally argues that North River's claims as the insureds' subrogee must be dismissed insofar as they seek "sums that are not due and may never fall due." GNY contends that North River may only sue to recover the first tier of the settlement, that is, the amount it paid to or on behalf of McIlhenny prior to the institution of this suit. It argues that North River is not entitled to recover the remainder, or second tier, of the "full settlement amount" of $5,250,000.

As noted previously, if North River recovers nothing in the present suit, it will not owe McIlhenny any more money. If, however, North River recovers from GNY the $4,250,-000 necessary to make up the "full settlement amount," it will reimburse itself for the first tier amount and pay the remainder to McIlhenny. North River is only obligated to make this second tier of payments to McIlhenny if it prevails in the present suit against GNY.

GNY cites *Associated Hospital Svc. v. Pustilnik* in support of its contention that North River may not sue it for a contingent second tier amount. 497 Pa. 221, 439 A.2d

---

6. In North River's complaint, this count is incorrectly captioned "Count VI." Both parties refer to this count as Count IV throughout their motions, and this court will do the same.

1149, 1151 (1981). GNY's reliance on *Pustilnik* is misplaced. The sole issue in that case was the amount of an insurer's subrogation interest in funds its injured insured recovered in a settlement. The insurer sought to recover the amount it had credited to its insured's bills in its own records rather than the discounted amount it had actually paid the insured's hospital. The Pennsylvania Supreme Court held that the insurer was not entitled to make a profit on the transaction by recovering the amount billed rather than the amount paid. *Id.*, 439 A.2d at 1151, 1153. In the instant case, however, North River will not receive any more than it has actually paid. The settlement agreement only permits North River to reimburse itself for the amount it has already paid to or on behalf of McIlhenny. Any amount in excess of this first tier amount will be paid to her. *Pustilnik*, therefore, is of no help to GNY.

The case of *Trustees of the University of Pennsylvania v. Lexington Ins. Co.*, 815 F.2d 890 (3d Cir.1987), cited by North River, is controlling. Estelle Soppe ("Soppe") had suffered catastrophic injuries while undergoing a diagnostic procedure at the Hospital of the University of Pennsylvania ("HUP"). Soppe brought suit in state court against HUP and the physician who had administered the procedure.

Three levels of medical malpractice insurance covered HUP and Soppe's physician at the time of the incident. The third level was a $10,000,000 excess policy HUP had with Lexington Insurance Company ("Lexington"). *Id.* at 893. Lexington disclaimed coverage shortly before trial on the basis of late notice of Soppe's claim. Thereafter, HUP settled Soppe's case in a two-tiered arrangement in which Soppe accepted $2,200,000, the limits of the first two levels of insurance. HUP also agreed to pay Soppe an additional $4,800,000 if it won a "bad faith" suit it agreed to initiate against Lexington to recover that amount. *Id.* at 894–95. Pending the resolution of the suit, HUP paid Soppe an additional $550,000. HUP could reimburse itself for this amount from monies won from Lexington if HUP succeeded. If HUP did not prevail, it agreed to pay Soppe's lifetime medical expenses and an additional $1,600,-000.

HUP won at trial against Lexington. On appeal, Lexington argued that it could not be liable for the second tier amount of $4,800,-000. Under its policy with HUP, its liability was limited to those sums its insured was "legally obligated to pay." Lexington argued that as the remaining liability of HUP was conditioned on the success of its suit against Lexington, HUP, as its insured, was not "legally obligated to pay" the entire second tier amount at the time of its settlement with Soppe. Accordingly, Lexington contended that it was not required to pay such an amount on behalf of HUP. *Id.* at 900. The Court of Appeals for the Third Circuit rejected Lexington's argument. It predicted that the Pennsylvania Supreme Court would not allow an insurer found to have acted in bad faith to "hide behind the 'legally obligated to pay' language of the policy...." *Id.* (citation omitted). The Court of Appeals then held that Pennsylvania would permit two-tiered settlements as long as they were reasonable in amount and made in good faith. *Id.* at 901–02, citing *Alfiero v. Berks Mut. Leasing Co.*, 347 Pa.Super. 86, 500 A.2d 169 (1985).

GNY argues that the holding in *Lexington* should be limited to cases in which the insurer denies coverage. This court sees no reason to distinguish suits brought alleging bad faith refusal to settle, such as the one at bar, from suits such as *Lexington*, alleging bad faith refusal to provide coverage. In either event, the insured may be exposed to additional liability by the insurer's wrongful actions. That the insureds in this case fortuitously happened to have excess coverage sufficient to satisfy the judgment and the subsequent settlement provides no reason to deviate from the holding of *Lexington*. Accordingly, GNY's motion to limit the amount of liability to which it is exposed should North River prevail on behalf of the insureds must be denied.

GNY also moves to strike various "boilerplate allegations" throughout North River's complaint pursuant to Rule 12(f) of the Federal Rules of Civil Procedure. GNY claims that allegations that it breached various duties by "other acts and/or omissions which

may become apparent through discovery" are both "immaterial" and "unduly prejudicial." While boilerplate claims may well be immaterial, this court declines to comb through North River's complaint sentence by sentence to eliminate them because we fail to see how they can be considered prejudicial. GNY's motion to strike will be denied.