**GREATER NEW YORK MUTUAL INSURANCE COMPANY,**

v.

**THE NORTH RIVER INSURANCE COMPANY; Crum and Forster Holdings, Inc.; Rodin Management Incorporated; Crown Park Investors (D.C. Civil No. 94–cv–05223).**

**NORTH RIVER INSURANCE COMPANY,**

v.

**GREATER NEW YORK MUTUAL INSURANCE COMPANY (D.C. Civil No. 94–cv–05554),**

**Greater New York Mutual Insurance Company, Appellant.**

No. 95–1484.

United States Court of Appeals, Third Circuit.

Argued March 11, 1996

Decided June 10, 1996.

James D. Crawford (argued), Schnader, Harrison, Segal & Lewis, Philadelphia, Pennsylvania, for Appellant.

Francis J. Deasey (argued), Timothy Costello, Deasey, Mahoney & Bender, Philadelphia, Pennsylvania, for Appellees.

Before: STAPLETON, SCIRICA and
COWEN, Circuit Judges

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

In *Trustees of the Univ. of Pennsylvania v. Lexington Ins. Co.*, 815 F.2d 890 (3d Cir. 1987), we predicted Pennsylvania law would allow a two-tiered or conditional settlement between a plaintiff and an insured when the insurer refused to defend against plaintiff's suit.[1] In this case we predict Pennsylvania law would also permit a two-tiered settlement between a plaintiff, an insured and the insured's excess insurer, when the primary insurer refused to settle plaintiff's claim.

### I.

#### A.

In January 1987, Sandra McIlhenny slipped and bruised herself on the steps of the Crown Park Apartments in Lansdale, Pennsylvania. Three months later she was diagnosed with multiple sclerosis. Shortly thereafter, McIlhenny brought suit in the Court of Common Pleas for Philadelphia County against the owner and manager of the building, Rodin Management, Inc., alleging the fall had precipitated or aggravated a previously dormant condition.

Rodin purchased primary liability insurance from the Greater New York Mutual Insurance Company with a one million dollar limit per occurrence. Rodin also purchased excess general liability insurance from the North River Insurance Company, with coverage from one million to ten million dollars.

Greater New York retained counsel to defend Rodin in McIlhenny's personal injury action, as it was obligated to do under its policy. McIlhenny initially made a demand of $770,000, but later increased the amount to $1 million. Defense counsel recommended settlement between $500,000 and $750,000, but Greater New York made no offer. The case went to trial and after the jury began deliberating, Greater New York offered $350,000. Plaintiff's counsel considered this amount to be a non-offer because "no reasonable person who had sat in that courtroom could make this offer." The jury awarded McIlhenny $4 million. The trial judge molded the verdict resulting in a total award of $5,796,000. Greater New York appealed to the Pennsylvania Superior Court.

The appeal was withdrawn, however, because North River on behalf of itself and Rodin, negotiated a settlement directly with McIlhenny for $5.25 million.[2] Under the settlement agreement, North River paid McIlhenny $1,949,629 and provided her with a lifetime annuity. In return, McIlhenny released North River and Rodin from all further liability. Because the $5.25 million settlement was greater than the amount McIlhenny received from North River and Greater New York, North River agreed to "exercise its best efforts to recover the full settlement amount from Greater New York through litigation or other proceedings." If North River prevailed, it would retain the first million and 60% of the overage; McIlhenny would receive the remaining 40%. To fund the litigation, McIlhenny channeled North River $400,000 of the one million she received from Greater New York.

#### B.

Before North River could bring an action against Greater New York, as it had agreed to do, Greater New York brought this suit in federal district court, alleging the settlement was invalid as a matter of law, and that North River and Rodin breached its duty of good faith. Greater New York also sought

---

1. A settlement in which the plaintiff is paid additional money in the event a specified condition is met is called "two-tiered." The conditional portion of the settlement constitutes the "second tier." *Cf. Lexington*, 815 F.2d at 893 ("[t]his type of settlement provides for the tort victim to recover a larger amount if the insurer is liable than if the tortfeasor must pay the settlement out of its own pocket.").

2. Initially, North River offered $2.5 million, but McIlhenny demanded $5.8 million. North River then agreed to a settlement of $5.25 million. Shortly before settlement was reached, Greater New York tendered McIlhenny its $1,000,000 policy limit.

the return of the one million dollars it had paid McIlhenny.

North River then filed suit in the Court of Common Pleas for Philadelphia County against Greater New York for bad faith on behalf of itself and as the assignee and equitable subrogee of Rodin. North River sought $4,250,000, representing the full value of the settlement less $1,000,000 already paid by Greater New York. Greater New York removed the claim to federal court, and the two cases were consolidated for discovery and trial.

In a pretrial order, the district court upheld the two-tiered settlement and dismissed all of Greater New York's claims against North River. *Greater New York Mut. Ins. Co. v. North River Ins. Co.*, 872 F.Supp. 1403 (E.D.Pa.1995). Holding two-tiered settlements are permitted under Pennsylvania law, it also determined an excess insurer owes no direct duty of good faith to a primary insurer when negotiating a settlement agreement. Greater New York appeals these orders.

At trial, a jury found Greater New York breached its duty of good faith to Rodin by failing to settle McIlhenny's lawsuit in a timely and satisfactory manner. The jury also found Rodin did not breach its duty of good faith to Greater New York by entering into the two-tiered settlement agreement. It gave North River a verdict for $4,432,324 ($5.25 million minus one million already paid by Greater New York plus other costs). Greater New York contends it was entitled to a directed verdict that it did not breach its duty of good faith. It also appeals certain evidentiary rulings.

## II.

### A.

■ The district court had jurisdiction based on diversity of citizenship. 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291. In diversity cases we must apply the substantive law of the state whose law governs the action. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). The parties agree Pennsylvania law governs. Our review of the district court's interpretations and predictions of state law is plenary. *Salve Regina College v. Russell*, 499 U.S. 225, 231, 111 S.Ct. 1217, 1220–21, 113 L.Ed.2d 190 (1991); *Wiley v. State Farm Fire & Casualty Co.*, 995 F.2d 457, 459 (3d Cir.1993).

### B.

■ The principal issue on appeal is whether the two-tiered conditional settlement assented to by McIlhenny, Rodin, and North River is permitted under Pennsylvania law. Because no Pennsylvania case has directly addressed the enforceability of two-tiered settlement agreements we must predict how the Pennsylvania Supreme Court would decide the issues before us. *U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co.*, 80 F.3d 90, 93 (3d Cir.1996). But this is not the first time we have examined a two-tiered settlement. In a similar case, after an exhaustive review of Pennsylvania case law and a thorough analysis of the relevant policies, we predicted the Pennsylvania Supreme Court would enforce a two-tiered settlement. *Lexington*, 815 F.2d 890.

*Lexington* involved a settlement by the Hospital of the University of Pennsylvania with a personal injury plaintiff. Under the settlement's terms, HUP agreed to pay $2.2 million itself and an additional $4.8 million if it won a suit against its insurer, Lexington, which had refused coverage.[3] Applying Pennsylvania law, we upheld the validity of the two-tiered settlement, subject to the requirements of good faith and reasonableness. *Lexington*, 815 F.2d at 902. "Prohibiting two-tiered settlements," we noted, may "force insureds to turn down advantageous

---

3. At the time of the accident HUP's malpractice insurance consisted of three levels. As required by Pennsylvania law, HUP covered itself for the first $100,000 of liability. The second level, provided by the Pennsylvania Medical Professional Liability Catastrophe Loss Fund, a state agency, consisted of $1 million for each health care provider. The third level was excess coverage, such as that provided to HUP by Lexington. For purposes of analyzing the *Lexington* decision, as we did in that decision, we will describe HUP as the insured and Lexington as the insurer.

settlement offers." [4] *Id.* at 901–02.

We see nothing in the facts of this case that would lead us to a different outcome. *Lexington*'s central rationale that a prohibition on two-tiered settlements would prevent some insureds from accepting advantageous settlements also applies where an excess insurer, an insured and a victim/plaintiff collectively forge a settlement. The mere addition of an excess insurer into the settlement equation does not alter our sense of how the Pennsylvania courts would assess the legality of two-tiered settlements.

Greater New York contends *Lexington* is inapposite because it involved a bad faith failure to defend while this case involves a failure to settle. Greater New York points out that in failure-to-settle cases the victim/plaintiff, its counsel, and the excess insurer have an incentive to color their testimony about settlement negotiations in the underlying lawsuit in order to recover as much as possible from the primary insurer. In contrast, failure-to-defend-cases brought by an insured against an insurer revolve around contractual duties and typically will not require the testimony of the victim/plaintiff or its counsel.

As *Lexington* makes clear, there are dangers associated with two-tier settlements, including the prospect of self-dealing and self-serving testimony. *See Lexington*, 815 F.2d at 902. Arguably this danger is heightened in excess insurer versus primary insurer failure-to-settle cases. But many kinds of cases provide inducements to color testimony, and we routinely leave it to juries to assess the forthrightness and honesty of witnesses. Witness credibility and the reasonableness of settlement agreements are questions of fact.

Nothing in Pennsylvania law indicates we should prohibit two-tiered settlements in order to guard against jury imperfection.[5] In this case reasonableness and good faith are factual issues that were squarely put to the jury.

III.

A.

■ The central issue at trial was whether Greater New York acted in bad faith in refusing to settle McIlhenny's claims. Greater New York maintains the evidence did not support the jury's finding it had failed to meet its duty. It argues it presented an adequate defense and believed it would prevail at trial on causation. Contending it had no affirmative obligation to make a settlement offer, it claims it never received a settlement offer within the range suggested by its counsel.

The district court required North River to prove by clear and convincing evidence that Greater New York did not honestly, intelligently, and objectively evaluate the McIlhenny case for jury verdict potential and settlement value. *See Puritan Ins. Co. v. Canadian Universal Ins. Co.*, 775 F.2d 76, 79 (3d Cir.1985) (enunciating standard of proof). Indeed, Greater New York does not challenge the jury instruction. Reviewing the record, we find there was ample evidence to support the jury's verdict. *See Walter v. Holiday Inns, Inc.*, 985 F.2d 1232, 1238 (3d Cir.1993) (a motion for judgment as a matter of law should only be granted if viewing all the evidence in the light most

---

4. "Insurance policies are risk-spreading devices. They exist primarily because the stakes of liability to an insured are greater than they are to the insurer, which can spread the loss across all of its customers. The impact of a settlement offer may be sufficiently great on an insured that it must risk the hazards of even greater liability after trial despite odds that make the settlement advantageous. Prohibiting two-tiered settlement may therefore force insureds to turn down advantageous settlement offers." *Lexington*, 815 F.2d at 901–02. Precluding such settlements is undesirable. This was the policy rationale set forth in *Alfiero v. Berks Mut. Leasing Co.*, 347 Pa.Super. 86, 500 A.2d 169 (1985), *appeal denied*

(Sept. 9, 1986), and as we indicated in *Lexington*, *Alfiero* is the most persuasive statement of Pennsylvania law. *See Lexington*, 815 F.2d at 902.

5. Indeed, we find some support for our conclusion in the Pennsylvania cases. Pennsylvania law allows an insured to assign his or her bad faith refusal to settle action over to the injured plaintiff. *See Gray v. Nationwide Mut. Ins. Co.*, 422 Pa. 500, 223 A.2d 8, 11 (1966). We perceive no greater danger of self-dealing and self-serving testimony arising from such an assignment than from an excess insurer bringing a bad faith suit pursuant to a two-tiered settlement.

favorable to nonmovant, no jury could decide in favor of the nonmovant).

The record reveals North River presented substantial evidence of Greater New York's bad faith in evaluating the claim and in refusing to settle. Regarding causation, Roberta D. Pichini, McIlhenny's counsel in the underlying litigation, testified defense counsel submitted a report from its medical expert, Dr. Alter, which agreed with plaintiff's medical expert, Dr. Poser, that trauma can cause dormant multiple sclerosis to become symptomatic. Furthermore, defense counsel supplied no expert report that could contradict the findings of plaintiff's rehabilitation witnesses.

With respect to damages, early in the litigation Pichini supplied Greater New York's defense counsel with reports from medical and rehabilitation experts, projecting rehabilitation damages of $5,000,000. At that time, plaintiff's settlement demand was $700,000 plus repayment of the Workmen's Compensation lien of $77,700. Pichini testified that she would have recommended acceptance of a pretrial offer of $750,000. As we have noted, neither defense counsel nor Greater New York made any offer of settlement before trial. After the jury began deliberating, Greater New York offered $350,000.

Max Solomon, Greater New York's Executive Vice President for Claims, had authority to settle claims between $25,000 and $1,000,-000. Solomon testified that defense counsel wrote a pretrial report for Greater New York on July 12, 1993, four days before trial, offering little or no hope that Rodin could escape liability for McIlhenny's fall. Defense counsel advised Greater New York there was a 50–50 chance the jury would believe the plaintiff's theory of medical causation and if so, could award a verdict from one to two million dollars. As a result, defense counsel recommended settlement between $500,000

and $750,000. On July 15, 1993, the day before trial, Solomon discussed the McIlhenny case with defense counsel. Solomon admitted that he had not evaluated letters or reports from defense counsel. Despite not having read defense counsel's pretrial report or having discussed the case in any detail with defense counsel, Solomon believed liability was questionable and the case should be tried. As a result, there was no offer of settlement.[6]

North River presented experts to support its claim of a bad faith refusal to settle. Perry S. Bechtle, Esq., testified Greater New York acted in bad faith in not evaluating the case after Dr. Alter examined plaintiff and in failing to settle within Greater New York's policy limits. Some of Greater New York's own witnesses also supported the jury's finding of bad faith. For example, Maureen Rowan, Esq., the defense attorney in the underlying suit, testified she believed it "probably" would have been reasonable to attempt to settle between $500,000 and $750,-000 before trial. During the course of her representation, Greater New York never asked her to provide an evaluation of jury verdict potential or settlement value (although four days before trial she wrote and transmitted an unsolicited report). Greater New York's own insurance expert, Walter Zimmer, testified that written evaluations are a necessary part of claims evaluation where the potential exposure exceeds one million dollars. Nonetheless, he admitted that no written evaluations were contained in the McIlhenny file. Together this evidence was more than sufficient for the jury to conclude Greater New York had acted in bad faith in refusing to settle.

### B.

There was also substantial evidence of the reasonableness of the settlement.[7]

---

**6.** When asked why Greater New York paid its $1,000,000 policy limit toward the post-verdict settlement of the McIlhenny action, Solomon testified:

> Well, because—we did because that would have only—that would have only indicated on our part that maybe there was more bad faith that you could have added on to that one. So

we felt—we felt that in good faith, we should pay a million dollars.

**7.** The district court charged: "if you find that the settlement between [Rodin and McIlhenny] was reasonable in its terms and amount, [Greater New York] may be held liable for the entire amount of the settlement regardless of the [Greater New York] policy limits."

Pamela McKinney, a claims representative for North River, testified that following the verdict she engaged in settlement discussions with McIlhenny's counsel, Pichini. North River settled, she said, because it received an opinion from counsel that Rodin's chances to prevail on appeal were less than 50%. In addition, post-judgment interest was accruing at the rate of $1,000 a day. The settlement agreement resulted in the complete release of all claims against Rodin and satisfied the judgment entered against Rodin.

Pichini testified that she believed the settlement was reasonable. Despite her confidence the verdict would be upheld on appeal, her client was in immediate need of funds for medical care. North River offered expert opinion from Joseph H. Foster, Esq., who testified that after a thorough examination of the trial record, he found the trial judge committed no reversible error. The chances of success on appeal, he said, were "very slim."

Perry Bechtle, Esq., also testified that the chances of success on appeal were very slim. Because post-judgment interest was accruing at the rate of $1,000 a day, and because appeals to the Pennsylvania Superior Court and Pennsylvania Supreme Court would take one to one and a half and two years respectively, he concluded it was reasonable to settle the case for $5.25 million. The settle-

ment agreement gave McIlhenny money for immediate medical care while providing Rodin with complete releases and satisfaction of the judgment.[8]

### C.

 Greater New York also contends the district court should have ruled as a matter of law that it did not breach its duty of good faith. We do not agree. The district court correctly observed that under Pennsylvania law primary insurers owe no direct duty of good faith to excess insurers. *Greater New York*, 872 F.Supp. at 1409. But it also correctly ruled North River could, as Rodin's subrogee, sue Greater New York for acting in bad faith. *Id.* Therefore, we will affirm the district court's refusal to dismiss all counts of North River's complaint alleging a breach of Greater New York's duty of good faith.

### IV.

Additionally, Greater New York contends the two-tiered settlement here offends the principles of equitable subrogation. *See Johnson v. Beane*, 541 Pa. 449, 664 A.2d 96, 100 (1995) (discussing the doctrine under Pennsylvania law).[9] As we have noted, North River brought this action as Rodin's subrogee.

---

8. In *Lexington* we mentioned that a jury might properly hear "that two-tiered settlements are fraught with the danger of self-dealing and should be scrutinized with extra care." *Lexington*, 815 F.2d at 902. Greater New York presented an expert witness, Peter Hoffman, Esq., who testified that because two-tiered settlements are forged by a non-adverse parties they present special risks. He opined these types of settlements are "fraught with danger of self-dealing and should be scrutinized with extra care." Thus, the jury was aware of potential problems with two-tiered settlements.

It also bears noting that, contrary to Greater New York's assertions, the reasonableness of a two-tiered settlement contingent on a bad faith suit has nothing to do with the allocation of the total settlement amount between the tiers. Only the total sum matters. Liability in a bad faith suit is premised on injury caused by the refusal to settle and has no relationship to the allocation. If liable, the insurer must pay the damages found by the jury, which can equal the total settlement amount; if not liable, the insurer is simply unaf-

fected by the settlement allocation. Only the injured party and settling insurer's interests are implicated in the allocation.

9. As a general matter "subrogation" is the "substitution of one person in the place of another with reference to a lawful claim, demand or right, so that he who is substituted succeeds to the rights of the other in relation to the debt or claim, and its rights, remedies, or securities." Black's Law Dictionary 1427 (6th ed.1990); *see also U.S. Fire Ins. Co. v. Royal Ins. Co.*, 759 F.2d 306, 309 (3d Cir.1985) ("The basic idea of subrogation is that of substituting the insurance carrier for the insured in the insured's action against a third party."). "The right of subrogation may be contractually declared or founded in equity." *Allstate Ins. Co. v. Clarke*, 364 Pa.Super. 196, 527 A.2d 1021, 1023–24 (1987). Equitable subrogation "does not arise from any contractual provision but is an assignment created by operation of law." *United States Fidelity and Guar. Co. v. United Penn Bank*, 362 Pa.Super. 440, 524 A.2d 958 , *appeal denied*, 517 Pa. 609, 536 A.2d 1333 (1987).

Greater New York contends that under Pennsylvania law a subrogee can only recover the amount it has paid on behalf of the subrogor. *See, e.g., Johnson,* 664 A.2d at 100 (subrogee stands in shoes of subrogor and may pursue an action to recover amounts paid to subrogor); *Associated Hospital Service v. Pustilnik,* 497 Pa. 221, 439 A.2d 1149, 1151 (1981) ("It is settled that the right of subrogation exists only to the extent of actual payment by the subrogee."). Because North River never paid, nor will it ever pay the second tier of the settlement agreement, Greater New York maintains North River cannot recover the amount "payable" under this tier. Its liability, if any, therefore must be limited to the first tier.

▆▆▆▆ But equitable subrogation is a legal construct, employed by courts when one person, acting involuntarily or under some obligation, pays the debt of another.[10] The rule is designed to facilitate the placement of the burden of debt on the party who should bear it. *Johnson,* 664 A.2d at 100. And whether in contract or equity, subrogation "is to be regarded as based upon and governed by equitable principles." *F.B. Washburn Candy Corp. v. Fireman's Fund,* 373 Pa.Super. 479, 541 A.2d 771, 774 (1988) (*quoting Allstate Ins. Co. v. Clarke,* 364 Pa.Super. 196, 527 A.2d 1021, 1023–24 (1987)). An insurer, including an excess insurer, upon discharging an insured's liability, can become equitably subrogated and may assert its insured's claims against third parties, including a primary insurer. *Cf. Brinkley v. Pealer,* 341 Pa.Super. 432, 491 A.2d 894, 898 (1985) (insurer's payment to insured renders insurer insured's subrogee and places insured in precise position of insurer); *see also* Barry R. Ostranger & Thomas R. Newman, *Handbook on Insurance Disputes* § 13.05 (1995).

Subrogation aims to avoid unjust enrichment. *United States Fidelity and Guar. Co. v. United Penn Bank,* 362 Pa.Super. 440, 524 A.2d 958, 964 , *appeal denied,* 517 Pa. 609, 536 A.2d 1333 (1987). But the two-tiered settlement here will not result in North River obtaining any more money than it paid to McIlhenny on behalf of Rodin. As the district court pointed out, the settlement only permits North River to reimburse itself for amounts already paid to McIlhenny. Any amount in excess of the first tier will be paid to McIlhenny.[11] *Greater New York,* 872 F.Supp. at 1410. North River has not sued Greater New York for more than it owes on behalf of Rodin; what it pays for Rodin will turn on its suit against Greater New York. Moreover, the fact that McIlhenny accepted a second-tier as part of the settlement does not create a cause of action for North River against Greater New York, nor does it make North River's suit against Greater New York more likely to succeed on the merits.[12]

---

**10.** *See* Cherry D. Williams, *A New Twist on Insurance Litigation: Stowers Suits by Excess Carriers Against Primary Carriers,* 33 S. Tex. L.Rev. 1, 21 (1992).

**11.** Under the 60%–40% allocation of proceeds from the suit against Greater New York, North River will not receive money in excess of amounts paid by it under the first tier of the settlement. *See Greater New York,* 872 F.Supp. at 1405. Nonetheless, we recognize that North River may benefit financially from the conditional character of the settlement. In some cases, a plaintiff could agree to forego some amount of assured payment in tier one for possible payment in tier two. In this case, for instance, plaintiff, taking account of the chance North River would prevail in its suit against Greater New York and the amount promised if North River prevails, would decide whether to accept a settlement with two tiers—one certain and one contingent. The practice of forging conditional settlements presents the theoretical possibility a subrogee will pay less than would be necessary to secure a one-tier settlement.

Yet this is not the kind of "profit-making" by the subrogee Pennsylvania courts have precluded under the doctrine. *Cf. Associated Hospital Service v. Pustilnik,* 497 Pa. 221, 439 A.2d 1149, 1153 (1981) (prohibiting insurer from recovering the amount it had credited insured's bills in its own records rather than the discounted amount it had actually paid the insured's hospital). Rather, in order for North River to settle for less than it would be able to under a one-tier regime, North River must have some chance of prevailing against Greater New York; otherwise the promise of a conditional payment would be of no value to McIlhenny. Thus, the amount a subrogee like North River can "save" with a two-tier arrangement is constrained by the merits of its prospective suit. This dynamic prevents the economics of two-tiered settlements from transforming them into a way for subrogees to reduce their payments without bearing any risk.

**12.** Greater New York argues the jury in the Greater New York–North River suit knows the only way to make the injured plaintiff whole is to

What Greater New York contests is that the level of payment to McIlhenny may vary depending on whether North River can make out a successful claim against Greater New York. As noted, Greater New York contends the right of subrogation exists only to the extent of actual payment by the subrogee. Yet in view of our discussion of the purposes of subrogation, without contrary direction from the Pennsylvania courts, we see no reason to proscribe two-tiered settlements because they involve payments conditioned on the outcome of suits by excess insurers against primary insurers.

## V.

Greater New York also contends North River owed it a duty of good faith in negotiating the settlement, and the district court erred by dismissing its claim for breach of duty. Confronted with an absence of definitive Pennsylvania case law, the district court looked to our prior holding in *Puritan Ins. Co. v. Canadian Universal Ins. Co.*, 775 F.2d 76, 79 (3d Cir.1985) (Pennsylvania would reject the theory of a direct duty running from primary to excess insurer), and to the Pennsylvania Supreme Court's decision in *D'Ambrosio v. Pennsylvania Nat'l Mut. Cas. Ins.*, 494 Pa. 501, 431 A.2d 966, 969–70 (1981) (there is no common law cause of action arising in tort for failure to act in good faith in connection with an insurance policy). Because a primary insurer owes no direct duty of good faith to an excess insurer, the district court could "see no reason" why this duty would run in the opposite direction. Therefore, the district court held that an excess insurer owes a primary insurer no direct duty of good faith under Pennsylvania law. *Greater New York*, 872 F.Supp. at 1406.

Nonetheless, Greater New York contends the district court was mistaken. It argues "[t]his duty arises as matter of law based on the doctrine of subrogation, and arises as a matter of necessity if an excess insurer is to be allowed to negotiate two-tiered settlement agreements."

Because in *Lexington* we approved two-tiered settlements subject to the conditions of "reasonableness and good faith," Greater New York contends that by negotiating a two-tiered settlement, North River assumed a duty of good faith. Greater New York also argues that because an insured owes a duty of good faith to its insurer, North River, by negotiating on behalf of its insured and becoming its subrogee, assumed the insured's duty to act in good faith.[13]

■ We are not convinced. *Lexington*'s requirement of "good faith and reasonableness" attaches to the settlement between the plaintiff and the insured or those standing in its place. It does not create an independent set of duties running between primary and excess insurers. Even if under Pennsylvania law an insured owes a duty of good faith to its insurer,[14] equitable subrogation does not create a distinct duty of good faith between the insured's subrogee, here the excess insurer, and a primary insurer.

Although Greater New York suggests two-tiered settlements necessitate the imposition of a duty of good faith on an excess insurer, nothing in Pennsylvania law indicates that equitable subrogation creates a duty of excess insurer to a primary insurer, independent of the duties the excess insurer assumed as subrogee. Of course, North River, as Rodin's subrogee, in its suit against Greater New York became subject to the claims and defenses Greater New York was entitled to assert against Rodin. *See U.S. Fire Ins. Co. v. Royal Ins. Co.*, 759 F.2d 306, 309 (3d

find Greater New York liable for the full amount of the second tier. Greater New York insists this provides an inducement for the jury to find Greater New York has acted with bad faith.

Again, Greater New York demonstrates deep suspicion of the deliberative capabilities of juries. We do not share this view, but in any event, we cannot read such a notion into Pennsylvania law absent clear guidance from its courts.

**13.** North River argues that Greater New York has waived these arguments by not raising them in the trial court. We do not agree. The issue

was raised before, and decided by, the district court. Although, on appeal, Greater New York has presented new theories on its duty of good faith claim, we find no waiver.

**14.** The district court found that Pennsylvania would apply the duty to act in good faith to each party to an insurance contract, including the insured. *Greater New York*, 872 F.Supp. at 1408. We need not reach this issue in deciding the matter before us.

Cir.1985) (with equitable subrogation "[i]t follows the excess insurer should assume the rights as well as the obligations of the insured in that position").

Yet the existence of Rodin's duty is undisputed. Indeed, the jury in the Greater New York–North River suit found that Rodin had not breached its duty of good faith to Greater New York.[15] In so doing, the jury established that North River did not breach the only form of duty it might have had to Greater New York.

## VI.

 Finally, Greater New York argues the district court erred by precluding the testimony of one of its central witnesses, Joseph McMahon, an employee with responsibility for handling McIlhenny's personal injury claim. Before trial, Greater New York represented that McMahon was seriously ill and could not be deposed or testify at trial. Then, on the Friday before trial he was deemed well enough to appear.[16] The jury had already been selected and the discovery deadline had long since passed. So had the date for submitting pre-trial memoranda. McMahon was not listed in pre-trial documents as a prospective witness. For several months Greater New York had insisted that McMahon would be unable to testify at deposition or at trial. North River relied on this representation in preparing for trial. For these reasons, the court determined his appearance would be highly prejudicial to North River. Balancing the equities, the court found the prejudice to North River from allowing McMahon to testify would be far greater than any potential prejudice to Greater New York.

Greater New York asserts this ruling "eviscerated" its ability to defend itself against the charge that it handled the McIlhenny claim in bad faith, and challenges the district court's ruling. We review such judgments under an abuse of discretion standard. *See Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 301 (3d Cir.1991). In light of the district court's thoughtful consideration of the equities, and its sound reasons, articulated after a hearing, we find the court acted well within its authority. We see no abuse of discretion.[17]

## VII.

Neither these alleged evidentiary errors nor the court's rulings on the issue of Greater New York's duty of good faith provide any basis for concluding the district court abused its discretion. Therefore, we find Greater New York's motion for a new trial was appropriately denied. *See Dunn v. HOVIC*, 1 F.3d 1362, 1364 (3d Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 650, 126 L.Ed.2d 608 (1993) (denial of motion for new trial is reviewed for abuse of discretion).

## VIII.

For the foregoing reasons we will affirm the judgment of the district court.

15. At trial, there was no evidence that Rodin failed to cooperate with Greater New York in the defense of the *McIlhenny* action. Ivan Krouk, an attorney representing Rodin, testified about Rodin's cooperation with Greater New York in the defense of the *McIlhenny* action and its lack of collusion in the postverdict settlement. Krouk testified that neither he nor any representative of Rodin had any involvement in the negotiation that lead to the settlement agreement. After signing the settlement agreement, Krouk said he was never advised by Greater New York that his approval and signing of the agreement would constitute a breach of the Greater New York policy. Nor did Krouk receive any notification from Greater New York that Rodin's approval and signing of the settlement agreement might constitute a breach of its duty to act in good faith.

Pichini testified Krouk was not present at the settlement negotiations entered into between her and McKinney of North River. Pichini testified she never spoke to Krouk or any employee of Rodin about settlement negotiations.

16. The parties dispute the circumstances related to McMahon's unavailability during his illness. North River strongly contends Greater New York improperly denied it access to McMahon prior to the trial.

17. We also affirm the other evidentiary rulings of the district court challenged by appellant—those involving the proffered testimony of witnesses Lachat, Egbert, Sibley, and evidence related to North River's claims handling practices and procedures. These judgments too were well within the court's discretion.